SCOTT TIMBER COMPANY,
Plaintiff–Appellant,

v.

UNITED STATES, Defendant–Appellee.

No. 02–5142.

United States Court of Appeals,
Federal Circuit.

June 26, 2003.

Alan I. Saltman, Saltman & Stevens, P.C., of Washington, DC, argued for plaintiff-appellant: With him on the brief were Ruth G. Tiger and Richard W. Goeken.

John S. Groat, Trial Attorney, Commercial Litigation Branch, Civil Division, Department of Justice, of Washington, DC, argued for defendant-appellee. With him on the brief were Robert D. McCallum, Jr., Assistant Attorney General; David M. Cohen, Director; Kathryn A. Bleecker, Assistant Director; Laurie Ristino, Office of General Counsel, Department of Agriculture, of Washington, DC; and Susan V. Cook, Senior Attorney, Environmental and Natural Resources Division, Department of Justice, of Washington, DC.

Before RADER, BRYSON, and GAJARSA, Circuit Judges.

RADER, Circuit Judge.

On summary judgment, the United States Court of Federal Claims determined that the United States Forest Service did not breach Scott Timber Company's timber sales contracts. *See Scott Timber Co. v. United States,* 40 Fed. Cl. 492 (1998) (*Scott I* ); *Scott Timber Co. v. United States,* 44 Fed.Cl. 170 (1999) (*Scott II* ); *Scott Timber Co. v. United States,* Nos. 94–784C, 96–204C, slip op. at 49 (Fed. Cl. filed July 11, 2001) (*Scott III* ). This dispute arose when the Forest Service suspended Scott's performance on the timber contracts to protect the marbled murrelet, a tiny bird indigenous to the forest areas covered by the contracts. Because five of the contracts at issue do not grant the Forest Service suspension authority, this court reverses the trial court's summary judgment that those contracts granted suspension authority. Because the evidence does not justify the disposition of the reasonableness issue on summary judgment, an issue of fact, this court also reverses the holding that the suspensions were reasonable as a matter of law. This court affirms the rest of the issues on appeal and remands for further proceedings.

I.

On January 12, 1988, the National Audubon Society and thirty-two of its chapters along the western coast filed a petition with the United States Fish and Wildlife Service (FWS) requesting a listing of the marbled murrelet as a "threatened species." On January 6, 1989, FWS proposed that a listing of the murrelet "as endangered or threatened is possibly appropriate." 54 Fed.Reg. 554 (Jan. 6, 1989). This notice also "encourage[d] Federal agencies and other appropriate parties to take [the murrelet] into account in environmental planning." *Id.* The Forest Service listed the murrelet as a "sensitive species" within Oregon and Washington in March 1989.

In 1990, the Forest Service solicited competitive bids for the sale and harvest of timber in the Siskiyou and Siuslaw National Forests in Oregon under section 318 of the Department of the Interior Appropriations Act of 1990, Pub.L. No. 101–121, 103 Stat. 701 (1989) (§ 318). Section 318, also known as the Northwest Timber Compromise, mandated that the "Forest Service shall offer ... an aggregate timber sale level of seven billion seven hundred million board feet of net merchantable timber from the national forests of Oregon and Washington for fiscal years 1989 and 1990." Pub.L. No. 101–121, 103 Stat. at 745–50. This provision responded to a timber shortage in the Pacific Northwest resulting from competing interests of environmentalists and the timber industry. *See Scott II,* 44 Fed. Cl. at 175 (citing *Robertson v. Seattle Audubon Soc'y,* 503 U.S. 429, 431–33, 112 S.Ct. 1407, 118 L.Ed.2d 73 (1992)). Scott won eleven of those contracts (hereinafter the § 318 contracts). The Forest Service awarded the § 318 contracts to Scott between April 9, 1990 and October 16, 1990.

The Court of Federal Claims determined, in an articulate and well-reasoned opinion, that the Forest Service's compliance with § 318 satisfied its obligations under the National Forest Management Act of 1976 (NFMA) and the National Environment Policy Act of 1969 (NEPA) to provide protection for sensitive species in offering timber sales contracts. *Scott II,* 44 Fed. Cl. at 175–79. In other words, the trial court determined that contracts under § 318 by definition complied with NFMA and NEPA, as well as the Forest Service's sensitive species program. *Id.* at 179; *Robertson,* 503 U.S. at 437, 112 S.Ct. 1407.

In April 1991, the Audubon Society filed suit to compel FWS to list the murrelet as threatened or endangered. *See Marbled Murrelet v. Lujan,* No. C91–522 (W.D. Wash. filed April 17, 1991) (the listing action). The plaintiffs in the listing action added the Forest Service as a defendant in September 1992, seeking to require the Forest Service to protect the murrelet under NFMA. The district court in the listing action issued a temporary restraining order on September 16, 1992, to prohibit "the logging of any marbled murrelet habitat."

On September 17, 1992, the Forest Service orally informed Scott that it was suspending operations under the § 318 contracts. The temporary restraining order expired ten days later. However, the Forest Service informed the district court that it would continue the suspension of logging operations until FWS made a final decision on listing the murrelet. Consistent with that representation, the Forest Service notified Scott that the suspensions would remain in effect indefinitely. By order of the district court, FWS listed the murrelet as a threatened species, effective September 28, 1992. *See* 57 Fed.Reg. 45,328 (Oct. 1, 1992).

Section 7 of the Endangered Species Act (ESA) and its implementing regulations require every federal agency to participate in a detailed consultation process to determine what impact, if any, that agency's operations will have on any newly listed species. *See* 16 U.S.C. § 1536(a)(2), (b) (2000); 50 C.F.R. pt. 402. Accordingly, the Forest Service initiated a formal consultation with the FWS to analyze the impact of the timber sales contracts in the Siskiyou and Siuslaw National Forests. By letter dated October 19, 1992, Scott informed the Forest Service that it intended to participate in the consultation as an "applicant" under the ESA, specifically 16 U.S.C. § 1536(a)(3). The Forest Service notified Scott on November 13, 1992, that it was entitled to participate in the consultation process. The formal consultation began on December 8, 1992. The ESA requires completion of the formal consultation within 90 days with a potential for extension up to 150 days upon written notice. 15 U.S.C. § 1536(b) (2000). The consultation may extend beyond 150 days only with the applicant's consent. *Id.*

FWS issued a draft biological opinion on July 20, 1993, which the Forest Service reviewed. After considering the Forest Service's comments on the draft biological opinion, FWS issued a second draft biological opinion on September 1, 1993. The second draft biological opinion concluded that the § 318 contracts jeopardize the murrelet. Further, the opinion foresaw no reasonable or prudent alternatives to terminating the contracts in murrelet habitat.

Scott attended two applicant meetings on the draft biological opinion in September and October 1993. On October 20, 1993, the Siuslaw Timber Operations Association, including Scott, submitted comments disagreeing with the finding of jeopardy and the lack of reasonable and prudent alternatives to the § 318 con-

tracts. In a letter to the Forest Service dated November 12, 1993, Scott expressed its preference for continued consultations rather than cancellation of the § 318 contracts. Scott further proposed "reasonable and prudent measures/alternatives" to permit operations under the § 318 contracts without harming the murrelet's habitat.

On May 11, 1994, FWS issued its final biological opinion, which effectively prohibited timber harvesting on all eleven of Scott's § 318 contracts. The final biological opinion found no reasonable and prudent alternatives to canceling timber sales in any areas of marbled murrelet habitat. Eventually, surveys found murrelet habitat in each of Scott's eleven § 318 contracts.

Scott and other timber companies filed suit in the United States District Court for the District of Oregon to challenge the final biological opinion as not complying with the ESA. *See CLR Timber Holdings, Inc. v. Babbitt,* No. 94–6403–TC (D.Or. Nov. 4, 1994). Due to a settlement, the district court dismissed this action without prejudice in the summer of 1994.

In an attempt to reconfigure the timber contracts to permit some harvesting without disturbing the murrelet, the Forest Service sought technical assistance from FWS through the latter part of 1994 and the early part of 1995. FWS issued a final amended biological opinion on June 12, 1995. This amended biological opinion did not permit any operations under the § 318 contracts at issue in this case.

On June 23, 1994, Scott submitted formal claims to the contracting officer (CO) under the Contract Disputes Act (CDA). Scott alleged that the Forest Service's prolonged suspensions of the § 318 contracts constituted a breach of contract. Scott contended that the Forest Service lacked authority to suspend operations under the § 318 contracts for an indefinite and extended period of time. Scott sought damages equal to the cost of obtaining replacement timber in the open market. The CO denied all of Scott's breach of contract claims. Scott began filing breach of contract actions for each of the § 318 contracts in the Court of Federal Claims on October 27, 1994. Those individual actions were consolidated into this case.

Contract clauses C6.01, C6.25, and B8.21 are at issue in this appeal. Six § 318 contracts contain clause C6.01: Cat Track (No. 074188), Raspberry (No. 074121), Formader 103 (No. 085068), Maria Skyline (No.085209), Skywalker (No. 085118), and Wapiti 305 (No. 083428) (collectively the C6.01 contracts). The remaining five § 318 contracts contain clauses C6.25 and B8.21, but do not contain clause C6.01: Toastberry (No. 073842), Father Oak (No. 073784), Beamer 712 (No. 085001), Formader 717 (No. 083410), and Indian Hook (No. 085126) (collectively the non-C6.01 contracts).

Clause C6.01 reads:

*Contract Clause C6.01*

C6.01—INTERRUPTION OR DELAY OF OPERATIONS. (6/90) Purchaser agrees to interrupt or delay operations under this contract, in whole or in part, upon the written request of Contracting Officer:

(a) To prevent serious environmental degradation or resource damage that may require contract modification under C8.3 or termination pursuant to C8.2;

(b) To comply with a court order, issued by a court of competent jurisdiction; or

(c) Upon determination of the appropriate Regional Forester, Forest Service, that conditions existing on this sale are the same as, or nearly the same as, conditions existing on sale(s) named in such an order as described in (b).

Purchaser agrees that in event of interruption or delay of operations under this provision, that its sole and exclusive remedy shall be (1) Contract Term Adjustment pursuant to B8.21, or (2) when such an interruption or delay exceeds 30 days during Normal Operating Season, Contract Term Adjustment pursuant to B8.21, plus out-of-pocket expenses incurred as a direct result of interruption or delay of operations under this provision. Out-of-pocket expenses do not include lost profits, replacement cost of timber, or any other anticipatory losses suffered by Purchaser.

Clause C6.25 reads:

### Contract Clause C6.25

C6.25# —PROTECTION OF HABITAT OR ENDANGERED, THREATENED, AND SENSITIVE SPECIES. (9/89) Location of areas needing special measures for protection of plants or animals listed as threatened or endangered ... or as sensitive ... are shown on Sale Area Map and identified on the ground. Measures needed to protect such areas have been included elsewhere in this contract or are as follows:

[none are listed in Scott's contracts]

\* \* \* \* \* \*

If protection measures prove inadequate, if other such areas are discovered, or if new species are listed as Federally threatened or endangered or as sensitive by the Regional Forester, Forest Service may either cancel the contract under C8.2 or unilaterally modify this contract to provide additional protection regardless of when such facts become known. In the event of modification under this Subsection, Purchaser shall be reimbursed for any additional protection required by the modification. ... Amount of reimbursement ... shall be in the form of a reduction in Current Contract Rates unless agreed otherwise in writing.

Finally, clause B8.21 reads:

### Contract Clause B8.21

B8.21 Contract Term Adjustment. "Contract Term Adjustment" means adjustment only as provided immediately above and for the three circumstances described in this Subsection. Under said circumstances, the contract term shall be adjusted in writing to include additional calendar days in one or more Normal Operating Seasons equal to the actual time lost, except as limited by (b) below.

\* \* \* \* \* \*

The three circumstances qualifying for a Contract Term Adjustment are:

(a) Purchaser experiences delay in starting scheduled operations or interruption in active operations either of which stops removal of Included Timber from Sale Area ... for 10 or more consecutive calendar days during a Normal Operating Season due to causes beyond the Purchaser's control, including but not limited to acts of God, acts of the public enemy, acts of Government, labor disputes, fires, insurrections or floods.

Scott moved for summary judgment on the non-C6.01 contracts, arguing that the Forest Service lacked authority to suspend operations under those contracts. The Government cross-moved for summary judgment on all eleven contracts. The Court of Federal Claims, in its initial opinion on March 12, 1998, reached the following conclusions:

- Scott's claims in this case are not jurisdictionally barred as new claims that were not originally presented to the contracting officer.

- Contract clause C6.01 expressly authorized the government to suspend operations under the contracts.
- Contract clause C6.25 implicitly authorized the government to suspend operations under the contracts.
- Contract clause B8.21 did not authorize the government to suspend operations under the contracts.
- Contract clauses C6.01 and C6.25 did not grant unlimited authority to suspend operations, but only authority to suspend for a reasonable duration.
- The Forest Service's actions surrounding the creation of the § 318 contracts and contract clause C6.25 represented and warranted that the Forest Service had taken adequate measures to protect sensitive species (like the murrelet) in designing the § 318 contracts, which created a triable issue of fact as to whether the suspensions were unreasonable in light of this warranty and representation.
- Section 318 did not discharge the Forest Service's duty to protect sensitive species, like the murrelet, in designing § 318 timber contracts.

*Scott I*, 40 Fed. Cl. at 499–508.

Due to the remaining factual issue of reasonableness, the Court of Federal Claims denied both parties' summary judgment motions. The United States then filed a motion to reconsider the holding that § 318 did not discharge the Forest Service's duties under NFMA and NEPA. On June 3, 1999, the Court of Federal Claims granted the motion for reconsideration and vacated its initial decision in part, holding as follows:

- Section 318 relieved the Forest Service of its duties under NFMA and NEPA to protect sensitive species, including the marbled murrelet, in designing § 318 timber contracts.

- Contract clause C6.25 did not create a warranty or representation that adequate measures had been taken to protect sensitive species in designing the § 318 contracts.
- The duration of the suspensions was not unreasonable.

*Scott II*, 44 Fed. Cl. at 175–181. By vacating the decision in *Scott I* to the extent it was inconsistent with *Scott II*, the Court of . Federal Claims essentially granted summary judgment to the United States that the suspensions did not breach any of the § 318 contracts.

In an amended complaint, Scott sought out-of-pocket expenses under the terms of the § 318 contracts, namely clauses C6.01 and C6.25, even if no breach was found. On June 11, 2001, the Court of Federal Claims issued an opinion regarding Scott's additional claims and held as follows:

- The suspensions did not constitute a contract modification "to provide additional protection" for the murrelet giving rise to reimbursement of out-of-pocket costs under contract clause C6.25.
- Scott is not entitled to recover sawmill overhead expenses as out-of-pocket costs under contract clause C6.01.
- A triable issue of fact exists as to whether Scott can recover attorney's fees and overhead for its own staff under contract clause C6.01.

*Scott III*, slip op. at 51–52. The parties entered a stipulation regarding attorney's fees and overhead costs for Scott's own staff, thereby extinguishing the only triable issue of fact remaining. Scott timely filed this appeal. This court has jurisdiction under 28 U.S.C. § 1295(a)(3) (2000).

## II.

In reviewing judgments of the Court of Federal Claims, this court re-

views conclusions of law, such as contract interpretation, without deference. *See Mass. Bay Transp. Auth. v. United States,* 254 F.3d 1367, 1372 (Fed.Cir.2001). Findings of fact made by the Court of Federal Claims are reviewed under the "clearly erroneous" standard. *City of El Centro v. United States,* 922 F.2d 816, 819 (Fed.Cir. 1990). This court reviews a grant of summary judgment by the Court of Federal Claims *de novo,* with justifiable factual inferences being drawn in favor of the party opposing summary judgment. *Winstar Corp. v. United States,* 64 F.3d 1531, 1539 (Fed.Cir.1995) (*en banc*), *aff'd,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996). A Court of Federal Claims ruling on its own subject matter jurisdiction is a question of law that this court reviews *de novo.* *Moyer v. United States,* 190 F.3d 1314, 1318–19 (Fed.Cir.1999).

Thus, in summary, this case presents for appeal six determinations by the Court of Federal Claims, namely, that (1) Scott's claims, which differ in form from those expressly made to the CO, are not jurisdictionally barred, (2) each of the eleven contracts provided the Forest Service with authority to suspend Scott's performance either expressly or impliedly, (3) the duration of the suspensions was not unreasonable, (4) the Forest Service did not warrant that no measures would be required to protect the Marbled Murrelet in the forest areas covered by the contracts, (5) the suspensions did not constitute a modification giving rise to reimbursement under the contract provisions, and (6) Scott cannot recover sawmill expenses because they are too remote and speculative.

*Jurisdiction*

As a preliminary issue, the United States contends that Scott has raised new claims in this action that were not previously presented to the CO under the requirements of the CDA. Specifically, the United States argues that Scott's original CDA claims questioned broadly the authority of the Forest Service to suspend the § 318 contracts and the reasonableness of the duration of those suspensions. According to the United States, Scott cannot raise new claims, such as the clause C6.25 warranty issue, the objections to Forest Service's preparation and administration of the contracts, and the claims for reimbursement provided under contract terms. The United States asserts that those claims were not "clearly and unequivocally" presented to the CO. *See Reliance Ins. Co. v. United States,* 931 F.2d 863, 866 (Fed.Cir.1991).

■ An action brought before the Court of Federal Claims under the CDA must be "based on the same claim previously presented to and denied by the contracting officer." *Cerberonics, Inc. v. United States,* 13 Cl.Ct. 415, 417 (1987); 41 U.S.C. § 605(a) (2000). This standard, however, does not require ridged adherence to the exact language or structure of the original administrative CDA claim. The Court of Federal Claims correctly found that it had jurisdiction over Scott's claims in this case, because they arise from the same operative facts, claim essentially the same relief, and merely assert differing legal theories for that recovery. *See Scott I,* 40 Fed. Cl. at 499–500; *Scott III,* slip op. at 51–52. This court "know[s] of no requirement in the [CDA] that a 'claim' must be submitted in any particular form or use any particular wording. All that is required is that the contractor submit in writing to the contracting officer a clear and unequivocal statement that gives the contracting officer adequate notice of the basis and amount of the claim." *Contract Cleaning Maint., Inc. v. United States,* 811 F.2d 586, 592 (Fed.Cir.1987). In this case, Scott gave the CO clear notice of a purported breach of contract based on the

prolonged and allegedly unauthorized suspensions. Moreover Scott sought from the CO the same remedy sought from the trial court, namely consequential damages for the alleged breach. Scott may have posed slightly different legal theories for the breach, but Scott's claim is essentially the same as presented to the CO. Thus, Scott's claims in this case would not "subvert the statutory purpose of requiring contractors first to submit their claims to the [CO]" to allow the CO to receive and pass judgment on the contractor's entire claim. *Croman v. United States,* 44 Fed. Cl. 796, 801–02 (1999). Accordingly, this court affirms the Court of Federal Claims' finding of jurisdiction.

*Authority to Suspend the § 318 Contracts*

■ This court applies general rules of contract interpretation in cases where the United States is a party to the contract. *See Lockheed Martin IR Imaging Sys., Inc. v. West,* 108 F.3d 319, 322 (Fed.Cir. 1997). Where, as in this case, the contract does not include ambiguous provisions, this court accords the contract terms their customary and accepted meaning. *See Alaska Lumber & Pulp v. Madigan,* 2 F.3d 389, 392 (Fed.Cir.1993).

The central issue in this case is whether the Forest Service had contractual authority to suspend operations under the § 318 contracts. The Court of Federal Claims found express suspension authority in clause C6.01. Both parties agree that clause C6.01 supplies express authority. Thus, the Forest Service had authority to unilaterally suspend operations under any contracts with the C6.01 clause. This case focuses primarily on clauses C6.25 and B8.21. The Court of Federal Claims concluded that C6.25 grants an implied authority to suspend operations, but B8.21 does not. This court agrees that clause B8.21 does not grant authority to suspend

the § 318 contracts. However, this court disagrees that C6.25 creates authority to suspend the contracts by implication.

■ Clause B8.21 permits contract term adjustments in three circumstances, one of which encompasses delays caused by "acts of government." In a broad sense, the listing of the murrelet as a threatened species was an act of government. Consequently, the Forest Service claims authority under this clause to delay Scott's operations. The language of clause B8.21, however, is contrary to the United States' position.

In the first place, clause B8.21 extends the contract performance when the "Purchaser experiences delay ... due to causes beyond the Purchaser's control." Thus, this provision applies to situations, such as acts of God, floods, fires, and the like, that prevent the purchaser from performing. By its terms, this clause does not authorize the Forest Service to suspend the purchaser's performance.

As the Court of Federal Claims correctly noted, clause B8.21 merely "contemplate[s] the possibility that the Government might delay [Scott's] performance of the contracts ... [but] does not provide authority for the Forest Service to unilaterally suspend the contracts." *Scott I,* 40 Fed. Cl. at 504. Subsection (a) of clause B8.21 refers to events that directly prevent the contractor from performing the contract, rather than events that induce the Forest Service to choose to suspend the contractor's performance. Clause B8.21(a) refers to "acts of God, acts of the public enemy, acts of Government, labor disputes, fires, insurrections or floods." The listing of the murrelet was not an intervening act that itself directly prevented Scott from performing under the § 318 contracts, such as a volcanic eruption that destroyed all the timber (act of God), or a labor dispute, or a flood or other events

referenced in this section. Rather, when the listing action occurred, Scott continued to perform. The only "act of Government" "beyond the Purchaser's control" that caused Scott to "experience[ ] delay" was the Forest Service's order to suspend. The Forest Service cannot argue that its own suspension order was an "act of Government" that authorized itself. Thus clause B8.21, by its terms, does not apply to the Forest Service's decision to suspend operations under the § 318 contracts.

In short, clause B8.21 expresses a clear purpose in clear language. It operates to give the contractor a right to a contract term adjustment in certain circumstances identified in subsection (a). It does not grant authority to the Forest Service to unilaterally suspend operations in order to create one of those circumstances.

■ With respect to clause C6.25, the Court of Federal Claims held:

[C]lause C6.25 implicitly granted the Forest Service authority to suspend the contracts ... [for] some reasonable amount of time to determine whether to cancel, modify, or go forward with the sale. Any other interpretation would essentially render the Forest Service's authority to modify or cancel a sale under clause C6.25 meaningless, particularly in light of the Forest Service's obligations under section 7 of the ESA to consult with FWS.

*Scott I*, 40 Fed. Cl. at 502–03. To the contrary, C6.25, by its express terms, does not grant authority to suspend operations under the § 318 contracts. The clause does not mention suspension at all. Instead it provides authority to cancel or modify the contracts when required to protect threatened or endangered species. Without any suspension authority, the authority to modify or cancel is not meaningless, as suggested by the Court of Federal Claims. Instead the Forest Service must

cancel or modify the contracts to protect threatened species, which in turn, under the clause triggers a right to reimbursement.

The contract itself in clause B7.311 expressly authorizes the Forest Service to suspend operations in the event of fire. Thus the contract expressly authorizes suspension for some circumstances. Interpreting this contract as an "organic whole, according reasonable meaning to all of the contract terms," *Lockheed,* 108 F.3d at 322, the absence of suspension authority in clause C6.25 must be read as the intent of the parties. This court must not presume to supply remedies the parties did not provide each other by contract, particularly where the contract shows that the remedies were within the contemplation of both parties at the time of contracting.

Even if clause C6.25 is ambiguous with regard to suspension authority, the evidence in this case clearly shows that clause does not grant the Forest Service authority to unilaterally suspend operations under the contract. "A principal objective in deciding what contractual language means is to discern the parties' intent at the time the contract was signed." *Winstar,* 64 F.3d at 1539 (citing *Arizona v. United States,* 216 Ct.Cl. 221, 575 F.2d 855, 863 (1978)). This court notes record evidence that shows the Forest Service in the past had always sought mutual consent for suspensions of timber sales contracts without ever referring to clause C6.25.

The addition of clause C6.01 is further evidence that the parties did not consider clause C6.25 to provide authority to suspend operations. In 1990 timber sales contracts began to include clause C6.01. A former contract administration specialist for the Forest Service, the individual who initially drafted clause C6.01, testified that prior to the addition of clause C6.01, it was

at best vague whether or not the contracts provided authority to suspend operations for environmental concerns. Clause C6.01 provided such authority, because the Forest Service believed unilaterally suspending operations prior to C6.01 "could create some liability for the government." In relying on clause C6.01 as one of many indications that C6.25 does not include suspension authority, this court is aware of *Mason v. United States*, 222 Ct.Cl. 436, 615 F.2d 1343 (1980), which states, "[s]ubsequent revision and clarification of contract language which has given rise to disagreement is only wise, and does not constitute an admission." In this case, clause C6.01 was not a revision or clarification of clause C6.25, but an entirely new and independent clause. Clause C6.01 does not refer to clause C6.25 at all. In any event, on its face, clause C6.25 does not contain the word "suspension" or any reference to suspension authority.

Accordingly, this court reverses the Court of Federal Claims' finding that clause C6.25 impliedly grants suspension authority to the Forest Service. It follows that the Forest Service breached the non-C6.01 contracts when it unilaterally suspended operations. The government raises the issue of whether Scott could legally have proceeded with the timber harvesting operations under the § 318 contracts after the murrelet was listed under the ESA regardless of the suspensions. Thus, the government argues that Scott cannot prove that it would not have been damaged but for the breach. That is a causation argument related to the damages, if any, that flow from the breach of the non-C6.01 contracts. Because that issue does not directly impact the breach analysis, the trial court must address that issue in the context of damages on remand. Thus, the record shows that Scott is entitled to summary judgment on the non-C6.01 contracts, and the Court of Federal Claims

may determine, on remand, the damages flowing from that breach.

*Reasonableness of the Suspension Period*

■ In *Scott I*, the Court of Federal Claims correctly found that "clause C6.01 does not authorize the Forest Service to indefinitely or permanently suspend the contracts." *Scott I*, 40 Fed. Cl. at 502. Therefore, in order for the prolonged suspensions in this case to be considered a breach of the C6.01 contracts, the "[c]ourt must determine whether the suspensions were reasonable." *Id.* (citing *Thomas Creek Lumber & Log Co. v. United States*, 32 Fed. Cl. 787, 790 (1995) ("It is a well-established principle of law that a party vested with contractual discretion must exercise his discretion reasonably.")).

Scott argues that the suspensions in this case are clearly unreasonable. In support, Scott cites section 7 of the ESA, which limits the consultation period to no longer than 150 days without consent from Scott as an applicant. *See* 16 U.S.C. § 1536(b) (2000). The consultation period in this case lasted over two years. According to Scott, a delay of years is *per se* unreasonable when the ESA only allows 150 days. Scott also argues that because the Forest Service knew the murrelet was likely to be listed as threatened before award of the § 318 contracts, the Forest Service's failure to conduct surveys and studies earlier also contributed to the unreasonably long suspensions.

The Government argues that the suspensions in this case were not unreasonable for various reasons. The murrelet habitat could not be adequately studied in less than two full years. Scott participated in the consultation period, where it expressed its preference for continued consultation rather than cancellation of the § 318 contracts. Finally, Scott filed a law-

suit challenging the final biological opinion, thereby extending the suspension period.

Initially, the Court of Federal Claims held that reasonableness of the suspension period was an issue of fact precluding summary judgment. *See Scott I*, 40 Fed. Cl. at 507. On reconsideration, the Court of Federal Claims concluded that, because § 318 discharged the Forest Service's duties under NFMA and NEPA in designing the § 318 contracts, the suspensions were not unreasonable as a matter of law. *See Scott II*, 44 Fed. Cl. at 181. Because the reasonableness issue is intensely factual, this court finds that the Court of Federal Claims erred when it determined the suspensions were reasonable on summary judgment.

As already noted, the consultation period in this case lasted for two years rather than the 150 days required by the ESA. Because the ESA provisions are not incorporated into the terms of the § 318 contracts, the Court of Federal Claims held that violation of the ESA 150–day guidelines has no bearing on the reasonableness of the Forest Service suspensions. In contrast, the Court of Federal Claims relied on the Forest Service's obligations to conduct formal consultations under the ESA to conclude that clause C6.25 authorized unilateral suspensions. While the violation of statutory obligations does not establish a breach of contract unless those statutory obligations are incorporated into the contract at issue, *see Smithson v. United States*, 847 F.2d 791, 794–95 (Fed.Cir. 1988), these violations may nonetheless serve as a factor in a reasonableness analysis. *See, e.g., Precision Pine & Timber, Inc. v. United States*, 50 Fed. Cl. 35, 63 (2001) ("the *Scott Timber* Court's reliance on *Smithson* is misplaced"). Although violations of statutory obligations not incorporated into the contract cannot constitute, by themselves, a breach of contract, this

court finds that the requirements under the ESA can be considered as a factor in the analysis of whether the suspensions were reasonable, which is a question of fact.

Also in support of finding unreasonableness, the Forest Service knew the murrelet would, in all probability, be listed as threatened and took no steps to survey the known habitat before awarding the § 318 contracts. The Forest Service knew the areas covered by the § 318 contracts encompassed murrelet habitat and might have greatly reduced the time of the suspensions if it had conducted surveys before awarding the contracts. Although NFMA and NEPA did not require the Forest Service to take such measures, due to the exemption granted by § 318, the Forest Service's decision to proceed without these preparations remains a factor in weighing unreasonableness.

On the other side of the issue, Scott actively participated in the consultation process, expressed its preference for continued consultations rather than cancellation, and filed a lawsuit challenging the result of the consultations. Finally, because the murrelet only comes inland to nest three to four months per year, the survey process requires two years. These factors are also relevant to a finding of reasonableness.

The facts referenced above are only examples of the various factual assertions that affect the reasonableness issue. To reiterate, justifiable factual inferences must be drawn in favor of the party opposing summary judgment. *See Winstar*, 64 F.3d at 1539. Summary judgment is inappropriate when "the evidence is such that a reasonable jury could reach a verdict in [the non-movant's] favor." *Golan v. Pingel Enter., Inc.*, 310 F.3d 1360, 1368, 64 USPQ2d 1911, 1915 (Fed.Cir.2002). This court finds that a reasonable jury might

reach either verdict based on the evidence of record. Drawing all justifiable inferences in favor of Scott precludes a grant of summary judgment to the Government that the suspensions were reasonable. Likewise, analyzing the evidence in a light most favorable to the Government precludes a grant of summary judgment to Scott that the suspensions were unreasonable. Therefore, this court reverses the Court of Federal Claims' grant of summary judgment to the Government that the suspensions were reasonable as a matter of law. Whether the suspensions in this case were reasonable, with respect to the C6.01 contracts, is a triable issue of fact to be adjudicated on remand.

*Warranty under Clause C6.25*

 Scott asserts that clause C6.25 warranted that there were no areas covered by the § 318 contracts needing special measures to protect sensitive species like the murrelet. According to Scott, this warranty was violated because the Forest Service was aware, at the time of preparing the contracts, that the murrelet occupied some areas covered by the contracts. Regardless of whether § 318 relieved the Forest Service of its obligations to provide protective measures for sensitive species under NFMA and NEPA, Scott contends the Forest Service voluntarily assumed those obligations by representing that it had determined that no protective measures were necessary. In at least one of the § 318 contracts at issue, the Forest Service provided protective measures for a sensitive species other than the murrelet. Scott also points to contemporaneous statements made by the Forest Service to third parties that it would comply with NEPA and NFMA in spite of § 318.

The Court of Federal Claims initially found that clause C6.25 created a warranty that no protective measures were needed for the murrelet under the § 318 contracts. However, this was based on its earlier finding that § 318 did not relieve the Forest Service of its duties under NFMA and NEPA. After properly correcting this holding on reconsideration, the Court of Federal Claims correctly held that C6.25 created no warranty.

Clause C6.25 states that "areas needing special measures for protection of . . . animals listed as . . . sensitive . . . are shown on the Sale Area Map. . . . Measures needed to protect such areas have been included . . . in this contract." None of the § 318 contracts contained protective measures for, or identified areas needing protection for, the murrelet. Because § 318 contracts are deemed to be in compliance with NFMA and NEPA, as well as the Forest Service's sensitive species program, the Forest Service was no longer obliged to provide protective measures for sensitive species under the NFMA and NEPA. *See Scott II,* 44 Fed. Cl at 179; *Robertson,* 503 U.S. at 437, 112 S.Ct. 1407. Therefore, that statement was absolutely true. No measures were "needed." This court agrees with the reasoning in *Scott II:*

> Even assuming the Forest Service possessed relevant information concerning the murrelet's protection that it could have included in clause C6.25, the representations contained in clause C6.25 fail to create an implied warranty as to any measures actually taken. An implied warranty concerning the adequacy of the Forest Service's design of the sales must be "founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties, showing, in the light of the surrounding circumstances, their tacit understanding." *Hercules, Inc. v. United States,* 516 U.S. 417, 424, 116 S.Ct. 981, 134 L.Ed.2d 47 (1996) (quoting *Baltimore & Ohio R.R. Co. v. United States,* 261 U.S. 592, 597,

58 Ct.Cl. 709, 43 S.Ct. 425, 67 L.Ed. 816 (1923)).

\* \* \* \* \* \*

In the face of a timber crisis, Congress expressly shifted the Forest Service's duty when designing sales from protecting sensitive species under NFMA and NEPA to minimizing fragmentation of old growth forest stands. *See* § 318(b)(1)-(2), (6)(A). Under these circumstances, the court is not persuaded that there was a meeting of the minds to provide special planning for the protection of the marbled murrelet.

*Scott II,* 44 Fed. Cl. at 180.

▮▮ Furthermore, "liability stemming from a misrepresentation in contract documents will be found only where the misrepresentation is one on which the contractor justifiably relies." *See Everett Plywood,* 190 Ct.Cl. at 92, 419 F.2d 425. Clause C6.25 states that

> If protection measures prove inadequate, if other such areas [needing special protective measures] are discovered, or if new species are listed as Federally threatened or endangered . . ., Forest Service may either cancel the contract under C8.2 or unilaterally modify this contract to provide additional protection *regardless of when such facts become known.*

(Emphasis added.) In light of that clear language, Scott could not reasonably rely on the assumption that no further protective measures would ever be needed in the areas covered by the § 318 contracts.

Because of § 318, no measures were necessary to protect the murrelet until it became listed as threatened or endangered under the ESA. That listing occurred after the award of the § 318 contracts. Clause C6.25 expressly anticipates such an event. This court, therefore, affirms the decision of the Court of Federal Claims that clause C6.25 did not create a warranty that the Forest Service breached by not providing protective measures for the murrelet in the § 318 contracts.

*Reimbursement under Clause C6.25*

Clause C6.25 provides, "In the event of modification under this Subsection, Purchaser shall be reimbursed for any additional protection required by the modification." Initially, the government, rather than advocating the finding of implied suspension authority under clause C6.25, argues that the suspensions in this case essentially amounted to a modification under clause C6.25. However, without a logical explanation, the Government also argues that the suspensions do not justify reimbursement under clause C6.25.

Scott also proffers contradicting arguments. Scott contends that clause C6.25 did not authorize the Forest Service to suspend the contracts, but only authorizes modifications. According to Scott, the suspensions were not an authorized modification under clause C6.25. Scott later argues that the suspensions amounted to a modification with rights to reimbursement under clause C6.25. Regardless of the parties' contradictory arguments, the Court of Federal Claims correctly declined to consider the suspensions in this case as modifications. The § 318 contracts clearly provide for modifications and suspensions in different clauses and as independent events. Accordingly, the suspensions in this case did not constitute a modification under clause C6.25.

*Sawmill Costs under Clause C6.01*

▮▮ Clause C6.01 provides for a "Contract Term Adjustment pursuant to B8.21, plus out-of-pocket expenses incurred as a direct result of interruption or delay of operations under this provision." Based on that language, Scott sought to recover various "out-of-pocket expenses." The Court of Federal Claims found a genuine

issue of material fact with respect to whether Scott's attorney fees and compensation to its own staff qualified as recoverable expenses under clause C6.01. The parties eventually settled on that issue. The Court of Federal Claims also determined that Scott's claims for costs related to sawmill operations, including labor, taxes and insurance, were "remote and speculative damages and therefore not recoverable." *Scott III,* at slip op. 57.

This court agrees with the conclusion of the Court of Federal Claims. Scott's sawmill expenses are not directly related to the timber sales contracts. Any sawmill costs were not a direct result of the suspensions in this case. "[R]emote and consequential damages are not recoverable in a common-law suit for breach of contract ... especially ... in suits against the United States for the recovery of common law damages." *Wells Fargo Bank, N.A. v. United States,* 88 F.3d 1012, 1021 (Fed.Cir. 1996) (quoting *Northern Helex Co. v. United States,* 207 Ct.Cl. 862, 866, 524 F.2d 707 (1975)). Accordingly, this court affirms the judgment of the Court of Federal Claims that Scott's sawmill costs are not recoverable under clause C6.01.

### III.

In conclusion, the judgment of the Court of Federal Claims that clause C6.25 granted implied authority to the Forest Service to unilaterally suspend the § 318 contracts is reversed. The Court of Federal Claims' finding that the suspensions were reasonable as a matter of law is also reversed. All other judgments of the Court of Federal Claims in this case on appeal before this court are affirmed. The case is remanded. On remand, the Court of Federal Claims will have the opportunity to address two issues: (1) the amount of damages Scott is entitled to for the Forest Service's breach of the non-C6.01 contracts, (2) whether the suspensions of the C6.01 contracts were reasonable, and if not, what damages Scott is entitled to due to the unreasonable delay.

### COSTS

Each party to bear its own costs.

*AFFIRMED–IN–PART, REVERSED–IN–PART, REMANDED.*