# United States Court of Appeals for the Federal Circuit

---

**KIEWIT INFRASTRUCTURE WEST CO.,**
*Plaintiff-Appellant*

**v.**

**UNITED STATES,**
*Defendant-Appellee*

---

2019-2125

---

Appeal from the United States Court of Federal Claims in No. 1:16-cv-00045-EJD, Senior Judge Edward J. Damich.

---

Decided: August 26, 2020

---

JOHN SPENCER STEWART, Stewart Sokol & Gray, LLC, Portland, OR, for plaintiff-appellant. Also represented by TYLER J. STORTI.

SOSUN BAE, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, for defendant-appellee. Also represented by ETHAN P. DAVIS, ALLISON KIDD-MILLER, ROBERT EDWARD KIRSCHMAN, JR.

---

Before PROST, *Chief Judge,* MAYER and LOURIE, *Circuit Judges.*

MAYER, *Circuit Judge.*

Kiewit Infrastructure West Co. ("Kiewit") appeals the judgment of the United States Court of Federal Claims granting the government's motion for summary judgment and denying Kiewit's request for an equitable adjustment for the cost of purchasing certain wetland mitigation credits. *See Kiewit Infrastructure West Co. v. United States*, No. 1:16-cv-00045, 2019 WL 2156459 (Fed. Cl. May 15, 2019) ("*Federal Claims Decision*"). For the reasons discussed below, we reverse and remand.

## I. BACKGROUND

On June 19, 2012, the Western Federal Lands Highway Division of the Federal Highway Administration ("FHA") issued a solicitation for a road design and reconstruction project (the "Deweyville project"). *See* J.A. 321–30; *see also* J.A. 331–32, 337. The project consisted of realigning and reconstructing approximately twelve miles of road running through the Tongass National Forest, a forest located on Prince of Wales Island in Alaska. *See* J.A. 292–93.

In conjunction with the issuance of the solicitation, the FHA provided offerors with a copy of a Waste Disposal Sites Investigation Report ("Waste Site Report"), which identified sites that a contractor could use to dispose of waste materials generated during road reconstruction. *See* J.A. 369–83. This report, which indicated that many of the potential waste disposal sites were located in existing rock quarries, contained estimates of the volume of waste each location could accommodate. J.A. 372. It also stated that "[t]he criteria for establishing waste disposal sites included identifying locations that would minimize negative impacts

to wetlands, wildlife, fisheries, streams, and karst formations." J.A. 372.[1]

The FHA also provided offerors with access to the "Categorical Exclusion," *see* J.A. 324–25, 341–59, a document that the agency had prepared in connection with its efforts to comply with the National Environmental Policy Act of 1969 ("NEPA"), 42 U.S.C. §§ 4321–70.[2] The Categorical Exclusion[3] stated that the FHA had determined that the Deweyville project would "not have a significant effect on the human environment," J.A. 352, and that "[t]he project was designed . . . to minimize the amount of fill placed into wetlands wherever possible," J.A. 350.[4] It further asserted

---

[1]    The Waste Site Report was not created for the Deweyville project, but instead for a previous highway project in the Tongass National Forest. *See* J.A. 369, 372.

[2]    "NEPA was passed by Congress to protect the environment by requiring that federal agencies carefully weigh environmental considerations and consider potential alternatives to the proposed action before the government launches any major federal action." *Lands Council v. Powell*, 395 F.3d 1019, 1026 (9th Cir. 2005); *see* 42 U.S.C. § 4321. When an agency identifies proposed actions that likely will "not have any significant effect on the environment, the agency may classify those actions as categorical exclusions." *Colo. Wild, Inc. v. U.S. Forest Serv.*, 435 F.3d 1204, 1209 (10th Cir. 2006).

[3]    The Categorical Exclusion issued in May 2012 but was amended in both July 2012 and April 2013. *See* J.A. 341, 347, 353.

[4]    The solicitation for the Deweyville project stated that the data contained in the Categorical Exclusion was "for the Contractor's information" and that the FHA would "not be responsible for any interpretation of or conclusion drawn from the data . . . by the Contractor." J.A. 324; *see also* J.A. 325.

that approximately forty-three acres of wetlands would be "permanently impacted by the proposed action." J.A. 350. Additionally, the Categorical Exclusion referred to the Waste Site Report and stated that:

> Material and waste sites are expected to be sourced at existing . . . quarries in the area as identified in the [Waste Site Report]. The sites identified in that report will serve as both material sources and waste sites and are included in this analysis of environmental resource impacts. No further analysis of the environmental impacts of using these sites for material and wasting is necessary at the sites identified in the report unless an expansion of a site is proposed.

J.A. 348.

The solicitation for the Deweyville project placed responsibility for "obtaining any necessary licenses and permits" on the contractor. J.A. 325. Specifically, it stated that the contractor was required to obtain "all permits and clearances needed for completion of the project," including permits required by the Clean Water Act, 33 U.S.C. § 1344.[5] J.A. 328. The solicitation further provided that the contractor was "responsible for purchasing [wetland]

---

[5]    An entity or individual who seeks to obtain a section 404 permit under the Clean Water Act can provide compensation for the unavoidable impacts that a project will have on wetlands through an in-lieu fee program, which allows for the purchase of compensatory wetland mitigation credits. *See* 33 C.F.R. §§ 332.1, 332.8; *see also id.* § 320.4(b)(2)(i) (stating that "[w]etlands . . . serve significant natural biological functions, including food chain production, general habitat and nesting, spawning, rearing and resting sites for aquatic or land species").

mitigation credits, if necessary." J.A. 337; *see also* J.A. 327.[6]

The solicitation also contained a provision, Revised Standard Specification 105.06 ("RSS 105.06"), which, like the Categorical Exclusion, referred to the Waste Site Report and stated that "[n]o further analysis of the environmental impacts of using [government-designated waste] sites [would be] needed unless an expansion of a site [were] proposed." J.A. 330. RSS 105.06 further stated that the government-designated waste sites had "received NEPA clearance." J.A. 330.

Prior to bid submission, Kiewit employees made a two-day visit to the Deweyville project site. J.A. 396, 425. Kiewit's total bid included approximately $1,000,000 for wetland mitigation fees.[7] *See* J.A. 125, 432, 583–84. The FHA awarded the contract for the Deweyville project to Kiewit on August 2, 2012. J.A. 125.

On March 7, 2013, Kiewit wrote a letter to the Deweyville project manager, Jane Traffalis, requesting an

---

[6]   On July 19, 2012, the agency issued solicitation amendment A004, which clarified that the contractor was responsible for the purchase of wetland mitigation credits and that it would not be reimbursed for the cost of such credits. *See* J.A. 337.

[7]   Kiewit asserts that the approximately $1 million it included in its bid for wetland mitigation fees only covered fees related to the roadway corridor and did not include any fees for wetland mitigation at the government-designated waste disposal areas. *See* Br. of Appellant 3 ("In reliance on the Government's representations in the Contract Documents, Kiewit's bid did not include costs associated with encountering any wetlands in the designated waste sites or paying any mitigation 'in-lieu credit' fees for such wetlands.").

equitable adjustment for the cost of purchasing mitigation credits for the wetlands it encountered at government-designated waste sites. *See* J.A. 386–87. Kiewit asserted that although RSS 105.06 stated that "[n]o further analysis of the environmental impacts of using [government-designated waste] sites" would be required unless a contractor expanded the sites, J.A. 330, its engineers had determined that there were approximately nineteen acres of wetlands at the designated sites, *see* J.A. 386. According to Kiewit, the additional cost of purchasing mitigation credits for wetlands at government-designated waste sites was "compensable under the contract changes clause." J.A. 386.

Traffalis responded by stating that Kiewit's claim for an equitable adjustment based on wetlands at the government-designated waste disposal sites was more appropriately evaluated as a differing site condition claim rather than a constructive change claim. *See* J.A. 393. She further asserted that Kiewit was not entitled to an equitable adjustment based upon a differing site condition because its contract with the FHA did not "represent[] anything about the presence or absence of wetlands at the disposal sites identified in the [Waste Site Report] and . . . a reasonable site investigation would have revealed the presence of wetlands." J.A. 395.

On June 3, 2014, Kiewit sent Traffalis another letter, again asserting that the requirement that it perform wetland delineation at the waste disposal areas was a compensable change. J.A. 396–97. Kiewit stated that it had "invested two complete days on a site investigation trip, which [was] unquestionably a reasonable investigation . . . on a competitively bid design build project in a remote location." J.A. 396.

Traffalis again denied Kiewit's request for an equitable adjustment. J.A. 398. She asserted that it was the FHA's conclusion that the presence of wetlands at the government-designated waste areas did "not constitute a change

to the contract, nor [was] it a differing site condition." J.A. 398. Kiewit then filed a certified claim with the contracting officer, stating that the basis of its "request for additional compensation [was] outlined in" its June 2014 letter to Traffalis. J.A. 399.

On January 15, 2015, the contracting officer issued a final decision denying Kiewit's claim for an equitable adjustment. J.A. 400–07. In the contracting officer's view, there had been no constructive change to Kiewit's contract with the FHA because that contract "made no representations that the . . . wetlands process [pursuant to section 404 of the Clean Water Act], including mitigation, was complete for the [government-designated] waste sites." J.A. 405.

Kiewit then appealed to the Court of Federal Claims, seeking an equitable adjustment in the amount of $490,387 and asserting that the presence of wetlands at the government-designated waste disposal sites was both a constructive change to its contract with the FHA and a differing site condition. *See Federal Claims Decision*, 2019 WL 2156459, at *1. Although the government argued that Kiewit's differing site condition claim should be dismissed because it had not been properly presented to the contracting officer, the Court of Federal Claims rejected this argument. According to the court, although Kiewit's differing site condition and constructive change claims relied upon "slightly different legal theories," they could be considered the same for jurisdictional purposes because they arose from the same set of operative facts and sought essentially identical relief. *Id*. at *9.

Turning to the merits, the court granted summary judgment in favor of the government on both Kiewit's differing site condition claim and its constructive change claim. *Id*. at *9–11. The court determined that although both RSS 105.06 and the Categorical Exclusion state that "[n]o further analysis of the environmental impacts of

using [government-designated] waste sites" would be required unless a contractor chose to expand those sites, *see* J.A. 330, 348, the term "environmental impacts" referred only to NEPA environmental impacts, not Clean Water Act environmental impacts. *Federal Claims Decision*, 2019 WL 2156459, at *10–11. According to the court, Kiewit "was justified in not inquiring further concerning environmental impacts of the NEPA type; it was not justified in not inquiring further concerning environmental impacts under the [Clean Water Act]." *Id.* at *11.

Kiewit then filed a timely appeal with this court. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## II. DISCUSSION

### A. Standard of Review

We review a grant of summary judgment by the Court of Federal Claims de novo. *Long Island Sav. Bank, FSB v. United States*, 503 F.3d 1234, 1244 (Fed. Cir. 2007); *see K-Con Bldg. Sys., Inc. v. United States*, 778 F.3d 1000, 1004 (Fed. Cir. 2015). We likewise review de novo the court's "conclusions of law, such as contract interpretation." *Scott Timber Co. v. United States*, 333 F.3d 1358, 1365 (Fed. Cir. 2003).

### B. Jurisdiction over Differing Claims

The Contract Disputes Act ("CDA"), 41 U.S.C. §§ 7101–09, "provides for the resolution of contract disputes arising between the government and contractors." *England v. The Swanson Grp., Inc.*, 353 F.3d 1375, 1379 (Fed. Cir. 2004). One prerequisite for the exercise of CDA jurisdiction by the Court of Federal Claims "is a final decision by a contracting officer on a valid claim." *Northrop Grumman Computing Sys., Inc. v. United States*, 709 F.3d 1107, 1111–12 (Fed. Cir. 2013) (emphases omitted); *see* 41 U.S.C. § 7103(a). Although "a CDA claim need not be submitted in any particular form or use any particular wording, it must contain a clear and unequivocal statement that gives the contracting

officer adequate notice of the basis and amount of the claim." *M. Maropakis Carpentry, Inc. v. United States*, 609 F.3d 1323, 1327 (Fed. Cir. 2010) (citation and internal quotation marks omitted); *see Hejran Hejrat Co. v. U.S. Army Corps of Eng'rs*, 930 F.3d 1354, 1357–59 (Fed. Cir. 2019).

Here, there is no dispute that Kiewit properly presented its constructive change claim to the contracting officer. *See* J.A. 39, 397–99. Nor is there any dispute that the contracting officer issued a final decision on that claim. *See* J.A. 45. The government contends, however, that the Court of Federal Claims "erred in exercising jurisdiction over Kiewit's differing site condition claim because Kiewit failed to submit a certified claim for a differing site condition to the contracting officer and, consequently, the contracting officer never issued a final decision upon such a claim." Br. of Appellee 24.

As we have previously made clear, two claims may be considered the "same" for CDA jurisdictional purposes if "they arise from the same operative facts, claim essentially the same relief, and merely assert differing legal theories for that recovery." *Scott Timber*, 333 F.3d at 1365; *see K-Con*, 778 F.3d at 1006 (explaining that "merely adding factual details or legal argumentation does not create a different claim, but presenting a materially different factual or legal theory . . . does create a different claim"). Here, we need not, and therefore do not, resolve the question of whether Kiewit's differing site condition and constructive change claims should be considered separate claims for CDA jurisdictional purposes. Because Kiewit's request for an equitable adjustment—which turns on the proper interpretation of solicitation provision RSS 105.06—can adequately be assessed under a constructive change rubric, it is unnecessary to consider its alternative theory of recovery based upon an alleged differing site condition. *See, e.g., States Roofing Corp. v. Winter*, 587 F.3d 1364, 1366 (Fed. Cir. 2009) (resolving the parties' "divergent interpretation[s]" of solicitation language and concluding that the

contracting agency's requirement that the contractor perform according to the agency's erroneous interpretation of that language was a constructive change to the contract); *Lockheed Martin IR Imaging Sys., Inc. v. West*, 108 F.3d 319, 322–24 (Fed. Cir. 1997) (accepting a contractor's reasonable interpretation of a solicitation provision and concluding that the contracting agency's contrary interpretation effected a constructive change); *Aydin Corp. v. Widnall*, 61 F.3d 1571, 1577 (Fed. Cir. 1995) ("To identify a constructive change, this court consults the contract language.").

### C. Kiewit's Constructive Change Claim

"A constructive change occurs where a contractor performs work beyond the contract requirements without a formal order, either by an informal order or due to the fault of the Government." *Int'l Data Prods. Corp. v. United States*, 492 F.3d 1317, 1325 (Fed. Cir. 2007); *see Zafer Taahhut Insaat ve Ticaret A.S. v. United States*, 833 F.3d 1356, 1361 (Fed. Cir. 2016) (explaining that "[e]ven absent a formal order under the Changes clause, the contracting officer may still *constructively* change the contract" (citation and internal quotation marks omitted)).[8]  In general, where a federal agency "requires a constructive change in a contract, [it] must fairly compensate the contractor for the costs of the change." *Aydin*, 61 F.3d at 1577; *see Int'l Data Prods.*, 492 F.3d at 1325 ("Equitable adjustments are corrective measures that make a contractor whole when the Government modifies a contract.").

Kiewit asserts that it performed work beyond the requirements set out in its contract with the FHA because it

---

[8]    The contract for the Deweyville project incorporated certain standard Federal Acquisition Regulation ("FAR") provisions, such as the FAR changes clause, 48 C.F.R. § 52.243-4.  *See* J.A. 119.

was required to purchase mitigation credits not only for wetlands in the Deweyville project's roadway corridor, but also for the wetlands it encountered at the government-designated waste disposal sites. According to Kiewit, because the solicitation affirmatively represented that a contractor would not need to conduct any further environmental impacts analysis of the government-designated waste sites unless it decided to expand those sites, *see* J.A. 330, it reasonably concluded that it would not need to perform any wetlands analysis at those sites.

We agree. Resolution of the dispute between Kiewit and the FHA hinges on the proper interpretation of the term "environmental impacts" in RSS 105.06. *See Federal Claims Decision*, 2019 WL 2156459, at *10. That solicitation provision states:

> Waste and excess material may be disposed at the sites listed in the [Waste Site Report]. The sites have received NEPA clearance. No further analysis of the *environmental impacts* of using these sites is needed unless an expansion of a site is proposed. If expansion is proposed, the requirements of Subsection 105.02(b) will apply. Obtain approval from the U.S. Forest Service before using these sites.

J.A. 330 (emphasis added).

By its plain terms, RSS 105.06 dictates that, unless a contractor decided to expand the government-designated waste sites, "[n]o further analysis of the environmental impacts of using" such sites would be necessary. J.A. 330. The government does not meaningfully dispute that the analysis required to obtain a permit under section 404 of the Clean Water Act, 33 U.S.C. § 1344, is an "environmental impacts" analysis. It nonetheless contends that "wetland delineation and payment of wetland mitigation credits" are excluded from the "environmental impacts" covered by RSS 105.06, Br. of Appellee 43, because that

provision "does not refer to section 404 of the Clean Water Act, or to wetlands, but only to NEPA," *id.* at 45; *see also id.* at 44–45 (arguing that because the sentence in RSS 105.06 containing the "environmental impacts" language "is directly preceded by the statement that the '[government-designated waste] sites have received NEPA clearance,' the only reasonable reading of [RSS 105.06] is that no further analysis of environmental impacts was necessary for NEPA clearance purposes" (quoting J.A. 330)).

This argument is unavailing for two reasons. First, contract language matters. *See, e.g.*, *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 826 (Fed. Cir. 2010) ("Our analysis begins with the language of the contracts."); *C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539, 1543 (Fed. Cir. 1993) ("A contract is read in accordance with its express terms and the plain meaning thereof."). RSS 105.06 does not state that no further environmental analysis would be necessary for NEPA clearance purposes if a contractor elected to dispose of waste and excess material at government-designated waste sites. *See* J.A. 330. Instead, it broadly provides that *"[n]o further analysis of the environmental impacts* of using [such] sites" would be required. J.A. 330 (emphasis added).

If the government intended to exclude wetland impacts from the "environmental impacts" covered by RSS 105.06, it should have included contract language to that effect. *See, e.g.*, *States Roofing*, 587 F.3d at 1369 (adopting a contractor's interpretation of a disputed contract provision where the contracting agency "'inadvertently' omitted a [provision] that could have avoided misunderstanding"). Because the government failed to do so, we decline "to rewrite the contract . . . and insert words the parties never agreed to." *George Hyman Const. Co. v. United States*, 832 F.2d 574, 581 (Fed. Cir. 1987); *see also Am. Capital Corp. v. FDIC*, 472 F.3d 859, 865 (Fed. Cir. 2006) (explaining that this court "cannot rewrite a contract or insert words to which a party has never agreed"); *Freightliner Corp. v.*

*Caldera*, 225 F.3d 1361, 1367 (Fed. Cir. 2000) (rejecting a proffered interpretation of a contract term "because it add[ed] an unnecessary interpretative gloss to the contract language").

Second, there is no merit to the government's argument that because the second sentence of RSS 105.06 states that the government-designated waste sites had "received NEPA clearance," Kiewit should have understood that the term "environmental impacts" in the next sentence excluded impacts to wetlands. There is no dispute that NEPA and the Clean Water Act are separate statutes; there is likewise no dispute that NEPA imposes duties on federal agencies rather than private parties. *See, e.g., Wilderness Soc'y v. U.S. Forest Serv.*, 630 F.3d 1173, 1177 (9th Cir. 2011) (explaining that "NEPA is a procedural statute that binds only the federal government"). Because NEPA requires federal agencies to "take a hard look at environmental consequences" of a proposed project or action, *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (citation and internal quotation marks omitted), however, an agency's NEPA assessment will frequently include an analysis of the impact that a proposed project will have on any wetlands in the project's vicinity. *See* Protection of Wetlands, Exec. Order 11,990, 42 Fed. Reg. 26,961 (May 24, 1977), *reprinted as amended in* 42 U.S.C. § 4321 note; *see also Greater Yellowstone Coal. v. Flowers*, 359 F.3d 1257, 1271–72 (10th Cir. 2004); *Miss. River Basin All. v. Westphal*, 230 F.3d 170, 173–77 (5th Cir. 2000); *City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1151–53 (9th Cir. 1997). Indeed, the FHA specifically considered the impact that the Deweyville project would have on wetlands as part of its NEPA analysis.[9] *See* J.A. 350.

---

[9] As will be discussed more fully below, the Categorical Exclusion, which the FHA prepared as part of its effort to comply with NEPA, identified approximately forty-three

We cannot accept, therefore, the government's argument that because RSS 105.06 states that the government-designated waste sites had "received NEPA clearance," it somehow excludes the analysis of wetlands from the provision's affirmative representation that "[n]o further analysis of the environmental impacts of using [those] sites" would be necessary. J.A. 330. To the contrary, the fact that the FHA, as part of the NEPA process, had already undertaken an evaluation of "the effects of [Deweyville] project activities on wetlands," J.A. 350, bolstered, rather than undercut, Kiewit's reasonable conclusion that it would not need to conduct any further wetlands analysis at the designated waste disposal areas.

D. The Waste Site Report and the Categorical Exclusion

Even assuming that the meaning of the term "environmental impacts" in RSS 105.06 were ambiguous, moreover, the Categorical Exclusion would alleviate any interpretive uncertainty.[10]  *See Per Aarsleff A/S v. United States*, 829 F.3d 1303, 1311 (Fed. Cir. 2016) (concluding that a term in a solicitation was ambiguous but that this ambiguity was resolved by reference to communications from the contracting agency); *see also Agility Pub. Warehousing Co. KSCP v. Mattis*, 852 F.3d 1370, 1381 (Fed. Cir. 2017) (concluding that both the plain language of the solicitation and the extrinsic evidence supported one interpretation of a disputed contract provision); *Gardiner, Kamya & Assocs., P.C. v. Jackson*, 467 F.3d 1348, 1354 (Fed. Cir. 2006) (explaining that "[w]hen a contract is ambiguous, before resorting to

acres of wetlands in the Deweyville project's roadway corridor but did not identify any wetlands at the waste disposal sites. *See* J.A. 350.

[10]    We need not decide whether either the Categorical Exclusion or the Waste Site Report was incorporated into the solicitation because resolution of this issue is unnecessary to our analysis.

the doctrine of contra proferentem, we may appropriately look to extrinsic evidence to aid in our interpretation of the contract" (citation and internal quotation marks omitted)).

The Categorical Exclusion, like RSS 105.06, represents that "[n]o further analysis of the environmental impacts of using" the government-designated waste sites would be necessary "unless an expansion of a site [was] proposed." J.A. 348. Notably, however, in the Categorical Exclusion, unlike in RSS 105.06, the "[n]o further analysis" language is not preceded by any reference to NEPA. *See* J.A. 330, 348. Thus, as the Court of Federal Claims correctly concluded, "[r]eading the Categorical Exclusion[], a reasonably prudent contractor would conclude that no further analysis was necessary regarding *any* environmental issues, that is, including ones arising under the [Clean Water Act]." *Federal Claims Decision*, 2019 WL 2156459, at *10.

The Categorical Exclusion states, moreover, that the FHA estimated that approximately forty-three acres of wetlands would be "permanently impacted" by the Deweyville project. J.A. 350. Importantly, however, notwithstanding the fact that the Categorical Exclusion represents that the waste sites were "included in [the FHA's] analysis of environmental resource impacts," J.A. 348, the agency's estimate of the wetlands that would be impacted by the project was based only on wetlands in the roadway corridor and not on the presence of any wetlands at the waste disposal areas. *See* J.A. 126; *see also* J.A. 489. The fact that the FHA included the waste sites in its environmental resource impacts analysis—and yet did not identify any wetlands at those sites—confirmed Kiewit's reasonable conclusion, based on RSS 105.06, that it would not need to perform wetland delineation at the government-designated waste areas.

The Waste Site Report, which was provided to all bidders and which discussed the details of twelve government-identified waste sites, J.A. 369–83, likewise supported

Kiewit's pre-bid determination that wetland delineation at the waste sites would be unnecessary. That report notes that many of the designated waste sites were situated in existing rock quarries.[11] J.A. 372, 376–79, 382–83. It further states that "[t]he criteria for establishing waste disposal sites included identifying locations that would minimize negative impacts to wetlands." J.A. 372.[12] The fact that the waste sites were selected to minimize any impact to wetlands reinforced Kiewit's conclusion that wetland delineation at those sites would not be required.

In sum, we conclude that Kiewit reasonably interpreted RSS 105.06 to mean what it says—that no further environmental impacts analysis would be required if a contractor chose to dispose of waste and excess material at government-designated waste sites. *See* J.A. 330. The FHA therefore effected a constructive contract change

---

[11] On appeal, the government argues that Kiewit should have recognized that there were wetlands at the government-designated waste sites because the Waste Site Report stated that there was a "palustr[ine] stream" on one of the sites. J.A. 379. Because this argument was not adequately presented to the Court of Federal Claims, however, we decline to address it on appeal. *See, e.g.*, *SimpleAir, Inc. v. Google LLC*, 884 F.3d 1160, 1170–71 (Fed. Cir. 2018); *DuMarce v. Scarlett*, 446 F.3d 1294, 1304 (Fed. Cir. 2006). We note, moreover, that the presence of a palustrine stream on one of twelve government-designated waste sites would not necessarily alert a bidder to the presence of approximately nineteen acres of wetlands, *see* J.A. 386, in the waste disposal areas.

[12] As Traffalis, the Deweyville project manager, acknowledged, moreover, the contract documents furnished to bidders did not contain "any affirmative statement" that there were wetlands at the government-designated waste sites. J.A. 540.

when it required Kiewit to perform wetland delineation at the government-designated waste sites.

## E. Damages Calculations

Before the Court of Federal Claims, the government argued that even if Kiewit prevailed on its constructive change claim, its right to damages was limited because its total wetland mitigation costs were less than $1 million. *See Federal Claims Decision*, 2019 WL 2156459, at \*2. It also argued that the amount of damages should be reduced because Kiewit had expanded the boundaries of the government-designated waste sites. *See id.* Nothing in this opinion should be interpreted to preclude the Court of Federal Claims from addressing these issues on remand.

## III. CONCLUSION

Accordingly, the judgment of the United States Court of Federal Claims is reversed and the case is remanded for further proceedings consistent with this opinion.

## REVERSED AND REMANDED

COSTS

Kiewit shall have its costs.