# ARMED SERVICES BOARD OF CONTRACT APPEALS

Appeal of -- )
)
Relyant, LLC )     ASBCA No. 59809
)
Under Contract No. W91B4N-08-D-0011 )

APPEARANCE FOR THE APPELLANT:     James H. Price, Esq.
                                  Lacy, Price & Wagner, PC
                                  Knoxville, TN

APPEARANCES FOR THE GOVERNMENT:   Raymond M. Saunders, Esq.
                                  Army Chief Trial Attorney
                                  MAJ Jason W. Allen, JA
                                  Trial Attorney

## OPINION BY ADMINISTRATIVE JUDGE PROUTY

The dispute before us,[1] which was aired in a three-day hearing, is centered upon the government's acceptance of certain pre-fabricated relocatable buildings (RLBs) for use at two different sites in Afghanistan. As will be described in far greater detail below, different government contracting officer representatives (CORs) at the two different locations had diverging views regarding whether the RLBs initially provided by appellant, Relyant, LLC (Relyant), should be permitted under the contract specifications that applied to both locations. In particular, the RLBs delivered to the first site passed a First Article Test (FAT) at that site, but were deemed to be out of compliance with the contract's statement of work (SOW) by the contracting officer (CO), and were not permitted at the second site. To get around the problem, Relyant shipped the RLB components first delivered to second site to the first site, where the local accepting authority (not the CO) apparently turned a blind eye to the RLBs' failure to comply with the SOW[2]; Relyant then revamped its means of manufacturing the RLBs to provide RLB components that satisfied the CO (and contract) at the second site. Yet, despite the equities of the matter superficially weighing in favor of Relyant for having had some units accepted, we find that we cannot grant it the relief

---

[1] We granted summary judgment in favor of the government in the related appeal of ASBCA No. 58172. *See Relyant, LLC*, ASBCA No. 58172, 16-1 BCA ¶ 36,228, *aff'd*, 683 F. App'x 960 (Fed. Cir. 2017). Citations to the Rule 4 file herein refer to a single Rule 4 file that was originally submitted for that first appeal and later supplemented for this one.

[2] To be clear, there was only one CO at a time on the contract. As noted, though, there was more than one COR.

sought. The CO was within her rights to hold Relyant to the specifications contained within the contract's SOW, and the evidence does not support a finding of superior knowledge on the part of the government. Moreover, the doctrine of good faith and fair dealing does not override the express terms of the contract; however, in the circumstances presented here, it does impose upon the government certain obligations with regard to timeliness of government responses to Relyant's request to amend the SOW, for which Relyant is entitled to certain relief.[3]

## FINDINGS OF FACT

### I. The Contract

The idea behind the RLB is rather clever: standard sized steel shipping containers — ubiquitous in the modern world and designed to be easily transported — would be modified to be used as modular building blocks to make larger buildings for use in contingency operations (tr. 1/195-96, 201-04). On 15 May 2008, the Bagram Regional Contracting Center in Afghanistan (the Army or the government) solicited proposals for the above-captioned contract (the contract), which was a multiple award, indefinite-delivery/indefinite-quantity (IDIQ) contract for the manufacture, delivery, and installation of RLBs in Afghanistan (R4, tab 1).

The seeds of the dispute that are now before us were sown in Relyant's[4] proposal in response to this solicitation. The SOW accompanying the solicitation for the contract required the installation of gypsum interior drywall to the interior of the shipping containers that would cover fiberglass insulation that was a minimum of three inches thick (R4, tab 1 at 17, ¶ 4.1.1.1). Relyant proposed a different configuration: this was the use of a sandwich panel, including Styrofoam[5] as the insulator, instead of separate insulation and drywall (R4, tab 243 at 11-12[6]; *see also* tr. 2/124-26). This configuration made all the difference in the world to how Relyant

---

[3] We also resolve a number of motions regarding the entitlement of Relyant to amend its complaint; the government's entitlement to amend its answer; and whether an adverse inference should be drawn against the government due to certain discovery hiccups. Our decisions on those matters – granting, in large part, the motions to amend the complaint and the answer and denying the motion for an adverse inference – will be explained herein.

[4] Critical Mission Support Services was Relyant's predecessor in interest for this contract and, in fact, was the company that bid on and obtained this award (tr. 1/44). We, nevertheless, generally refer to it as Relyant, herein, for simplicity.

[5] Relyant's Chief Executive Officer (CEO), Mr. Smith, testified that the insulating material in the sandwich panel was polystyrene, as opposed to Styrofoam (tr. 2/127). For our purposes, this is not a material difference.

[6] These pages are numbered 8 and 9 in Rule 4, tab 248.

would manufacture the RLBs. Its single sandwich panel would be less likely to be damaged during shipping than the drywall/insulation combination (tr. 2/155), thus Relyant could install the sandwich panel at its factory in Turkey prior to shipping it to Afghanistan, rather than shipping the items separately and installing the drywall in Afghanistan (*id.*, tr. 2/207). Indeed, the advantages of this method were key to Relyant's operations plan (*see generally* tr. 2/196, 206-07).

On 22 September 2008, the Army awarded the above-captioned contract (the contract)[7] under the solicitation to Relyant (R4, tab 1 at 1). The contract signed by Relyant and the government did not adopt the change to the SOW proposed by Relyant relating to the substitution of the sandwich panel for the drywall and insulation interior walls (R4, tab 1),[8] although Relyant's management initially assumed that the proposal had been adopted (tr. 2/176). As will be seen, this assumption was unfortunate.

The contract incorporated by reference a number of standard clauses under the Federal Acquisition Regulation (FAR), including FAR 52.209-4, FIRST ARTICLE APPROVAL — GOVERNMENT TESTING (SEP 1989) (hereinafter, the first article test clause or FAT clause), with the words "Shall be incorporated in every delivery order" immediately following its notation (R4, tab 1 at 39). One provision of this FAT clause that is of importance to the dispute here is paragraph (b), which provides in part, "The notice of...approval [of the test] shall not relieve the Contractor from complying with all requirements of the specifications and all other terms and conditions of the contract."

Another contract provision that is important with respect to changes to the SOW is contained in paragraph 3.0 to the SOW portion of the contract, "Modifications," which provides that "[a]ll...modifications to requirements specified in this SOW must be directed by the Contracting Officer (CO)" (R4, tab 1 at 15).

The contract also included the FAR's Ordering clause (FAR 52.216-18, ORDERING (OCT 1997)), which provides that, in the event of a conflict between a task order and the contract, "the contract shall control" (R4, tab 1 at 44).

---

[7] Relyant was not the only awardee under this multiple award task order contract (tr. 1/45-46).

[8] Relyant's proposal was written in such a way that the government was not required to accept its proposed deviation from the solicitation's SOW (tr. 2/175).

3

## II.     Delivery Order 1

Delivery Order 1 (DO1) was issued to Relyant on 22 September 2008 (R4, tab 4), the same day the contract was awarded. DO1 required the delivery and installation of nine two-story RLBs to Forward Operating Base (FOB) Sharana, Afghanistan (Sharana) (*id.* at 1-2). DO1 also included a requirement to submit one of the nine RLBs delivered to Sharana for first article testing within 180 days (i.e., by 21 March 2009), and included the previously-discussed FAT clause (*id.* at 2-3).

Subsequent to the issuance of DO1, the parties recognized that DO1 had failed to make any allowance for the cost differential of delivering the RLBs to Sharana, as opposed to Bagram Airfield Afghanistan (Bagram) (the contract had a contract line item number (CLIN) for delivery to FOBs that had been inexplicably left off of the DO[9]) (R4, tab 9 at 1-4). Apparently, because of funding constraints, the number of RLBs provided by DO1 needed to be reduced in order to accommodate the added delivery costs (R4, tab 6 at 1 (Relyant noting that, absent increased funding, the number of RLBs would need to be reduced)). The parties also decided to "incorporate mechanical and window changes into CLIN 0002 unit pricing" (R4, tab 24 at 2). Thus, on 2 and 3 April 2009, the parties executed bilateral Modification No. P00001 to DO1 that reduced the number of RLBs provided and installed by Relyant from nine to six, changed the pricing of the RLBs to some degree, amended the SOW, and added an unpriced CLIN (with a "not to exceed" amount) for transportation of the RLBs to FOB Sharana (*id.* at 1-3). The portion of the SOW that required the drywall/insulation combination remained unmodified by this change order (*see generally* R4, tab 24). This modification also included a "release of claims," stating that the modification constituted "a full, complete and final accord and satisfaction" of all claims "attributable to the changes contained herein or the events that give rise to them" (*id.* at 4).

## III.    Delivery Order 2 and Others

On 24 December 2008, the Army awarded to Relyant DOs 2 and 3 for the delivery and installation of one and two more RLBs, respectively, at Bagram (R4, tabs 17-18). Three days later, on 27 December 2008, the Army awarded DO4 to Relyant for the delivery and installation of two additional RLBs at Bagram (R4, tab 19). The RLBs ordered by these DOs were all two stories tall (R4, tab 17 at 1-2, tab 18 at 1-2). Two additional DOs (5 and 6) were issued on 1 February 2009 for the

---

[9] Though this CLIN referenced transportation from Bagram to Sharana (*see* R4, tab 1 at 4), the parties understood that transportation of RLBs to Sharana would not necessarily go through Bagram. They understood that what was being priced by this CLIN was the cost differential of shipping RLBs to Sharana from Turkey, versus the less expensive option of shipping them to Bagram from Turkey (tr. 2/106-07, 134-36).

4

installation of two more RLBs at Bagram each (*see* R4, tab 268[10] at 2), but these, like DOs 3 and 4, have no bearing upon this appeal. In sum, the government ordered a total of 15 RLBs from Relyant, 6 of which came from DO1, one from DO2.

IV.   Delivery of the RLBs, Government Concerns, and the First Article Test of the RLB Delivered to FOB Sharana

Manufacture of the "cans"[11] in Turkey began sometime in late 2008 or early 2009 and the first of them were delivered to Sharana sometime in early April 2009, with their first mention in the record being found in an internal Army email, dated 7 April 2009 (*see* R4, tab 255 at 330). This email discussed the planning of a government inspection of RLB cans delivered to Sharana. Although government officials believed these were non-compliant with the contract for several reasons, including their being damaged during shipping,[12] Relyant believed it could repair these (*see id.*).

DO1, as noted above, required delivery of a first article RLB for testing at Sharana, consistent with the contract's requirement for first article testing. DO2, however, required the delivery of an RLB to Bagram. Although the normal, prudent course of action for a contractor like Relyant might have been to complete the FAT for DO1 at Sharana first and then construct the cans for subsequent RLBs, because of scheduling pressure for DO2, Relyant felt that it could not wait to pass the FAT before it began shipping cans for later RLBs to Bagram (tr. 2/28). Consistent with the parties' desire to expedite matters, Relyant and the government came to an agreement that, rather than require a FAT for each DO (as required by the original contract), passing the FAT for the DO1 RLB would be sufficient to meet FAT requirements for subsequent DOs (*see* tr. 1/52-53). Thus, on 21 May 2009, they executed Amendment 1 to DO2 to make this change to that delivery order (this change also explicitly adopted the FAT clause into the delivery order as required by the contract) (R4, tab 36), and effected the change contract-wide through change Modification No. P00004 to the contract, executed on 18 June 2009 (R4, tab 246).

Part of the motivation for simplifying the FAT procedures was the issue of progress payments under the contract. Under the FAT clause, the CO believed that no partial payments could be made to Relyant on a DO until after an RLB for that DO

---

[10] The government's 12 hearing exhibits are renumbered and referenced herein as Rule 4, tabs 265 through 276.

[11] A "can," as used here, refers to a shipping container modified for use as an RLB component (tr. 1/195-96).

[12] There was testimony that some of the damage came from bullets during an ambush of the convoy that shipped the cans to Sharana (tr. 2/194-95).

passed the FAT (tr. 2/32-33). Relyant reasonably sought relief so that it could obtain cash flow to support its work on the project (*see, e.g.,* R4, tab 41 at 2).

According to Relyant, the first cans were delivered to Bagram (at the "wounded warrior" site[13]) on 20 April 2009 (R4, tab 249). This is consistent with a 21 April 2009 email from Air Force First Lieutenant (1Lt) Aaron Zorn, the COR at Bagram to Captain (Capt) Ron Hilliard (the CO at the time) and others in the government which Relyant now asserts supports its claim of superior knowledge. We do not read this email the same way that Relyant does (more about this later), but reproduce it in full here because of the importance Relyant now places on it:

> Gentlemen,
>
> [Relyant] made a number of changes to the IDIQ design for the buildings in Sharana. The "government" there okayed these changes. From that point, they began construction on our containers with the new mods. They discussed these mods with us 2 months ago. For the most part, these changes made sense, but we asked them to resubmit every change they made so that our team could bless them off. They have yet to send us any documentation of the changes and now the cans are here. I have mentioned this before to everyone (my bosses, Captain Moore and I'm not sure if I mentioned it officially to Capt Hilliard). The answer was "we'll deal with it when they get here." Well, they're here now. How are we going to go about accepting them? For example, the walls are not drywall. They even brought us a sample to a meeting. We said we agreed that the material had some advantageous qualities, but asked that they provide paperwork to officially get them approved. In the process, they would be required to provide the fire ratings of the material. What if it's no good now? Are we going to make them rip out the walls? We need to discuss how we're going to tackle this.

(R4, tab 250)

---

[13] The "wounded warrior" site was the location for the DO2 RLB at Bagram (tr. 2/137, 144).

6

This email highlights a contract administration problem that had been brewing for some time: unauthorized decision-making relating to the SOW. Both Sharana and Bagram had Field Engineering Teams (FETs) tasked with overseeing the implementation of the RLB construction efforts from the government's side (tr. 3/10). The FET in Bagram, however, can best be described as being senior to the Sharana FET, since it had drafted the original SOW and was the primary resource of technical expertise for the CO (*id.*), who alone had the authority to amend the SOW (tr. 3/11). Nevertheless, in their (understandable) desire to solve problems and get RLBs completed, the Sharana FET appears to have prematurely agreed to changes to the SOW without getting proper approval from the CO (tr. 3/19-20). Captain (Capt) Timothy Moore, the CO who was stationed at Bagram, took action to rein this in once it came to his attention and raised it in a meeting with Relyant there (tr. 3/20-21) and on other occasions (tr. 3/23-24). The point was further made in an email sent by the Sharana COR to Relyant on 6 October 2008, where it was underscored that responses to requests for information that could potentially affect future DOs and could also affect requirements for all contractors would be coordinated through Capt Moore at Bagram (R4, tab 30 at 3-4).

After overcoming a number of challenges, including its use of the wrong standard for electrical wiring (R4, tab 55 at 1-2), Relyant passed the FAT at Sharana on 25 August 2009 (R4, tab 62). According to testimony by Mr. Smith, Relyant's CEO, who spent approximately three weeks at Sharana to be on hand for the FAT, the government personnel conducting the tests at Sharana made no objection, in his presence, to the use of the sandwich panel in lieu of the drywall/insulation combination (tr. 2/148-49). Mr. Smith noted that the government official overseeing the FAT at Sharana, Lieutenant Colonel (Lt Col) Herrington (who was the COR at that location (tr. 1/39)), must have been aware that they were using the sandwich material, but there was no testimony that the subject was ever specifically raised to his attention (tr. 2/149). Ultimately, around 22 August 2009, Lt Col Herrington informed Mr. Smith that Relyant's RLB in Sharana had passed the FAT (tr. 2/148-49; R4, tab 62). Upon Lt Col Herrington's recommendation, the CO, Ms. Pleasant,[14] formally accepted the results of the FAT on 25 August 2009 (R4, tabs 62, 63).

## V.    Relyant's Request to Use the Sandwich Panel in Deviation from the SOW

Despite allowing Relyant to pass the FAT at Sharana in late August 2009, the CO had rejected the material substitution of the sandwich panel for the insulation/drywall earlier that same month. Relyant's efforts to obtain approval for the

---

[14] On 22 April 2009, administrative control of the contract on the government side passed from Afghanistan, where Capt Hilliard had been the CO, to the Rock Island Contracting Center (RICC) in Illinois where Ms. Pleasant became the CO, holding that role through November 2009 (R4, tab 26; tr. 1/38-39).

substitution began almost a year earlier. On 1 November 2008, Relyant submitted a written request to then CO, Capt Moore, to substitute the sandwich panel for the walls and ceilings, as opposed to the drywall/insulation requirement contained in the SOW (R4, tab 273 at 3-5). This request was likely discussed with Capt Moore before it was submitted, although he has no independent recollection of it (tr. 3/15). There is evidence that this initial request was lost due to a computer systems crash on the part of the government in November 2008 (tr. 3/59; R4, tab 273). In any event, as will be discussed shortly, there is no persuasive evidence that the request was ever granted by the CO, while there is significant evidence that it was not granted.

Relyant claimed to have re-sent the substitution request to the government shortly after being informed of the computer crash (*see* R4, tab 257 at 483), but there was no evidence presented at the hearing from either Relyant or the government to support that assertion. Contemporary evidence (in the 21 April 2009 email from 1Lt Zorn discussed above (R4, tab 250)) supports a finding that the government was waiting for Relyant's resubmittal. The first substantiated re-submission of the request appears in a 22 April 2009 email from Relyant to the government in which Relyant forwarded the 1 November 2008 substitution request to the government (R4, tab 257).[15] Relyant sent a follow-up email on 30 April 2009 asking for "information concerning the submittals" and stating that Relyant would "need documentation to proceed" (R4, tab 29). On 12 May 2009, Relyant again raised the issue in an email to 1Lt Zorn, stating that, "we need approval of the submittals I sent some time ago to prevent delays in the actual assembly...I have not had a reply other than that it is being looked into" (R4, tab 33). 1Lt Zorn replied to this email the next day, stating in part:

> As far as submittals are concerned, the FET has okayed all of them, but RICC is going about making it official. I'm not sure what this process includes. They thought it was already handled, but they were referring to the main 3 mods that came down. I'm not sure if I can give you the go ahead – I wouldn't want to direct you and then something change. At least, so your mind is at ease, the FET has okayed those changes. Thanks for your continued aggressiveness on this project execution.

(R4, tab 34 at 1)

---

[15] The author of this email made the statement that he had previously sent another copy of the substitution request to the government after the November computer crash, but, as noted above, there is no other evidence of such a submission.

There is no documentation in the record that the subject arose again until 23 July 2009, when 1Lt Zorn informed Relyant that the material substitution request needed to be submitted on a different form (R4, tab 237 at 41).

In response to this request from the government, on 30 July 2009, Relyant forwarded to the CO an "AF IMT 3000" Material Submittal form, seeking approval to utilize the sandwich panel (R4, tab 248). Consistent with the recommendation made by 1Lt Katherine Schultz (who had just succeeded 1Lt Zorn as COR at Bagram (*see* R4, tab 245 at 2)), it was rejected by the CO, Ms. Pleasant, on 5 August 2009 (R4, tab 248). 1Lt Schultz had noted that Styrofoam (which she believed to be part of the panel) was combustible and could burn quickly if the fire retardant additive to the material were overcome by a larger fire, and that the sandwich panels would not meet the one-hour firewall requirement in the contract (*id.* at 3).

The evidence presented by Relyant to support its allegation that an authorized representative of the government had earlier agreed to the material substitution was not persuasive. At the hearing, Relyant presented the testimony of Mr. Creed Williams, its project manager at Bagram, that "one of the first contracting officers...before Captain Moore" had approved the sandwich panel substitution relatively early on in contract performance (tr. 1/120-22). Mr. Mills, Relyant's project manager at Sharana, also testified to his "understanding" that Capt Moore had "signed off" on the substitution request before issuing DO2 (tr. 2/160). Mr. Williams' testimony was rather vague and appeared to be based upon what Mr. Mills had told him, notwithstanding his statement that he had "no question" that the approvals had been submitted (tr. 1/121). Mr. Mills' "understanding" of what Capt Moore (as opposed to the CO before Capt Moore, whom Mr. Williams testified about) had agreed to had an even less firm basis than Mr. Williams'. It would not be inconsistent with Relyant's general corporate belief that, in making the contract award to Relyant, the government adopted its technical proposal (*see id.*). To the extent that "the government" at Sharana had "Okayed" the changes, as stated in 1Lt Zorn's 21 April 2009 email quoted above (*see* R4, tab 250), that email is most consistent with unauthorized personnel making such statements, especially in light of the email's further statements that Relyant had been directed to submit a formal substitution request months earlier, which had not been forthcoming at the time of the email (*see id.*). Although we do not question the sincerity of these witnesses, we do find their testimony on this matter to be unconvincing.

Indeed, overwhelming evidence supports a finding contrary to this testimony. First, Capt Moore testified at the hearing that he did not recall approving the substitution request (tr. 3/16). This is consistent with the contract documents reflected in the Rule 4 submission, which includes Modification No. P00001 to the contract (by numbering convention, the first modification), dated 23 December 2008 (R4, tab 15), followed next by Modification No. P00002 to the contract, dated 22 April 2009, which changed the contracting office (R4, tab 26). If there had been any written change after

9

P00001, but before the 22 April 2009 modification, it would have received the P00002 numeration and the 22 April modification would have received a later number. Further, if Capt Moore or anybody else in the government had approved the substitution, we would expect that Relyant could produce documents stating as much; it never did.[16] Moreover, if the two Relyant managers had actually seen such approvals, we would expect them to have made some sort of statement to the government, when they resubmitted their substitution requests in April and July 2009, that Capt Moore or somebody from the government had already approved them. Instead, they were submitted as if they had already been provided to the government but not acted upon (*see* R4, tab 257). Indeed, the notion that the submittals had been previously submitted, but not acted upon, is inherent in the correspondence from Relyant in April through June 2009, discussed at length above. This indicated that Relyant was waiting for the government's approval of its submittals, including the 12 May 2009 statement that, "I have not had a reply other than that it is being looked into." (R4, tab 33) Thus, we conclude that this is what happened here, and the government did not approve the deviation.

On 10 August 2009, Relyant sent a letter to the CO informing her that it would not resubmit the submittals, but would, instead, forward the cans from Bagram to Sharana, where they were considered to be acceptable (R4, tab 249).[17] The record does not reflect what, if any, response CO Pleasant made to this letter, but apparently she permitted noncompliant RLBs to be accepted at Sharana,[18] and all six RLBs built at Sharana used the sandwich material (tr. 2/147). Indeed, as noted above, the cans

---

[16] As written "evidence" of the submittals having been approved, Relyant's post-trial brief references pages of tab 237 to the Rule 4 file (app. br. at 5). It turns out that tab 237 is Relyant's claim to the CO, and the cited pages are Relyant's narrative assertions of what happened during contract administration. Needless to say, the evidentiary weight of unsubstantiated assertions contained within a contractor's claim is nil.

[17] Just as we would have expected Relyant to refer to any prior government approvals of material substitutions when it resubmitted its requests in April and July 2009, we would also expect that there would be some reference to this key fact in this letter if it had actually happened. Instead, the letter makes no such assertion, lending further support to our conclusion that it never did.

[18] There is no evidence explaining why noncompliant RLBs at Sharana were accepted and others, at Bagram, were not. There is anecdotal evidence, though, that housing shortages in Afghanistan were compelling the government to accept otherwise inadequate buildings made by other contractors (R4, tab 42 at 2). That housing shortage was a reason that Lt Col Herrington (who was the COR at Sharana) did not recommend terminating Relyant's contract in April 2009, at a time he believed they were delinquent in providing the RLBs (R4, tab 260 at 650-51).

10

previously delivered to Sharana (which used the sandwich panel) were allowed to pass the FAT just a few weeks later.

The cans at Bagram were, in fact, shipped to Sharana, beginning in August 2009 and continuing through that October (R4, tab 86 at 2, tab 237 at 12, tab 247). Relyant then changed the process of manufacturing the cans for the remainder of the contract (the five RLBs to be erected at Bagram under DOs 2, 3, and 4), shipping drywall to Afghanistan and having much of the work finishing the cans performed there (tr. 2/151).

## VI.  Subsequent Amendments to DO2

Shortly after Relyant passed the FAT, the parties agreed to change portions of the SOW of the contract going forward and to apply those changes to DO2 and other, later delivery orders. On 11 September 2009, the parties executed Modification No. P00007, a bilateral modification to the original contract which incorporated changes into the SOW for the original contract and to amend the prices of several CLINs (R4, tab 69). On the same day, they executed related bilateral modifications to DOs 2, 3, and 4 applying the changes in the SOW and in the price reflected in P00007 to these DOs (R4, tabs 70-72). DO1 was unchanged, and the changes to the SOW did not affect the pre-existing requirement for the drywall (id.). None of these changes included any general releases of claims (id.).

The delivery dates for DO1 and DO2 changed as well. Before the acceptance of the FAT, on 14 and 15 July 2009, the parties executed Modification 2 to DO1 to extend the first article and production due date of the first RLB to 29 July 2009 (R4, tab 43). Pursuant to this modification, the remainder of the RLBs required by DO1 would be delivered in approximately two-week increments starting on 28 August 2009, to be completed by 22 October 2009 (id. at 2). Although there are no further contract modifications extending the period of performance for DO1 in the evidence before us, the final RLBs under that DO (the fifth and sixth ones) were not completed and accepted by the government until 19 July 2010 (R4, tab 212 at 5, 7).

On 13 and 19 October 2009 the parties executed Modification No. P00004 to DO2, which extended the period of performance for DO2 from 30 September 2009 to 3 January 2010 (R4, tab 88 at 1-3). This modification included no general release of claims (id.). By Modification No. P00005 to DO2, dated 3 February 2010, the CO granted Relyant an additional 45 days (until 21 February 2010) to complete the DO (R4, tab 140). Again, this modification included no release of claims (id.). The RLB was, in fact, completed and turned over to the government on 17 March 2010 (R4, tab 172).

11

## VII.     Relyant's Claim to the Contracting Officer

On 23 January 2015, Relyant submitted a document captioned, "request for equitable adjustment" to the CO (R4, tab 237 at 1). We refer to this as "Relyant's claim," because it included a "total claim" amount of $1,005,051 and included certification language along with the signature of Relyant's vice president, Mr. Biles (R4, tab 237 at 16).[19] Although Relyant's claim initially stated that it was for extra costs incurred on DOs[20] 1 and 2 (R4, tab 237 at 1), in response to a question from the CO, Relyant explained that all of the additional costs should be ascribed to DO2 (R4, tab 239).

Relyant's claim included extended factual recitations (*see* R4, tab 237 at 1-5) and what we would characterize as an overview of its entitlement to compensation (*id.* at 6-7). Specific legal theories justifying its entitlement to damages followed (*id.* at 7-10).

The first legal theory expressed by Relyant in support of its claim was contained in a section labeled, "Breach," and was that the government wrongly rejected the DO2 material submittals, which it alleged had been approved for DO1 (R4, tab 237 at 7-8). Although Relyant's particular theory about why this alleged inconsistency constituted a breach of contract is not explicitly clear, this "Breach" section of Relyant's claim went on to argue that the government failed to disclose, for approximately 237 days, its superior knowledge that it might not approve the submittals for DO2 that it had for DO1 (*id.* at 8). Earlier in the factual section of Relyant's claim, it alleged that government staff at Bagram had informed Relyant that the government would accept the specifications that Relyant alleged had been accepted at Sharana (*id.* at 4). Relyant's "overview" of the claims included the factual allegation that 1Lt Zorn had informed Relyant, on 13 May 2009, that the submittals "looked good and would be approved" (*id.* at 7).

The second section of Relyant's claim, labeled "Change," argued that the rejection of the DO2 submittals constituted a material change to the contract since they had previously been accepted for DO1 (R4, tab 237 at 8-9).

---

[19] A document entitled as a request for equitable adjustment can be considered a claim under the Contract Disputes Act (CDA), regardless of its title, if it otherwise meets the requirements of a claim. *Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1577-78 (Fed. Cir. 1995). The government has not alleged that Relyant's claim failed to meet the CDA's requirements and we perceive no basis to question our jurisdiction.

[20] Relyant's claim and associated correspondence consistently refer to the DOs as Task Orders (*e.g.*, R4, tab 237 at 1), which we have observed in some government correspondence as well. We correct that relatively trivial misnomer throughout.

Relyant then asserted that the government was responsible for delay damages coming from its failure to act in a reasonable time to approve the DO2 submittals and for failing to have the "lay down areas" at Bagram adequately prepared for the cans sent there (R4, tab 237 at 9). Relyant elaborated that the government's failure to timely act upon the submittals caused it to suspend its work at Bagram until they were rejected (*id.* at 10). Other damages argued to be due were the $381,875 in burdened costs of shipping the DO2 cans to Sharana from Bagram (*id.* at 12); the $172,004 in burdened labor costs of individuals at Bagram from April 2009 through August of the same year (*id.* at 13)[21]; and $417,064.22 in damages from unabsorbed overhead (*id.* at 15). Combined with $34,108.50 interest at the time of the claim and $34,715.89 profit on the shipping costs, Relyant calculated damages of $1,005,051 (*id.* at 15).

The CO denied Relyant's claim on 13 November 2014 (R4, tab 240) and this timely appeal, docketed on 30 January 2015, followed.

PRELIMINARY MATTERS

Before we can reach the merits of this matter, we address three motions whose resolution will affect the legal theories governing our consideration of this appeal and the evidence that we consider in resolving it. First, we consider Relyant's motion to amend its complaint, which we grant in part and deny in part, and the related motion by the government to amend its answer, which we grant. Next we consider Relyant's motion to impose an adverse inference upon the government for its inability to find and produce certain documents in discovery. We deny this motion.

I. The Parties' Motions to Amend

On 20 October 2016, after the close of discovery, Relyant filed a motion to amend its complaint (app. mot. to amend). Although the amendment purported to be only for purposes of "clarifying certain aspects" of its claims (*see* app. mot. to amend at 1), in fact, it added eight new paragraphs of facts and five new claims for relief (*see id., attach. (redlined complaint)* (amended compl.). Indeed, Relyant's initial complaint filed with the Board is rather Spartan with respect to elucidating the theories for which it asserts it is entitled to relief, alleging generally that the government breached its contract by wrongfully rejecting the RLBs (*see* complaint, dated 27 February 2015). The proposed new complaint includes far greater emphasis on the actions of the government in allegedly knowing that Relyant was going forward with using the sandwich panel and not raising any concerns with Relyant about it for a

---

[21] According to Relyant's claim, this amount can be broken down to $20,188 for the month of April; $49,126 for May; $33,925 for June; $43,153 for July; and $25,612 for August (R4, tab 237 at 13). These figures were supported with uncontroverted testimony during trial (tr. 1/178-81).

number of months, and misleading Relyant into thinking that it would be approved (amended compl. ¶¶ 21-26). The additional causes of action that went significantly beyond those in the original complaint included a breach of the implied duty of good faith and fair dealing (*id.* ¶¶ 63-67); failure to disclose superior knowledge (that the government would not accept the sandwich panels at Bagram) (*id.* ¶¶ 68-73); and promissory estoppel on the notion that the government had led Relyant to believe that it would approve its use of the sandwich panels (*id.* ¶¶ 74-77).

The government opposed, in part, Relyant's motion to amend, arguing that two of the additional causes of action (superior knowledge and promissory estoppel) were not based upon the same operative facts as in Relyant's claim to the CO, thus, we did not possess jurisdiction to consider these (gov't opp'n to app. mot. to amend). We did not decide the motion at the time that it was first briefed because we judged it unnecessary prior to the hearing and did not wish to delay this appeal by issuing a jurisdictional decision. The parties were instructed to present the same evidence that they would if the motion to amend were granted.

On 31 October 2016, 11 days after Relyant's motion to amend, the government filed a motion to amend its answer to add the affirmative defenses of accord and satisfaction, release, and waiver (gov't mot. to amend answer). The justification for this filing was primarily that the requested amendment was permissible and that it was necessary as a matter of fairness after Relyant's motion to amend its complaint. The parties were instructed to proceed under the assumption that this motion would be granted.

Subsequent to the hearing in this matter, at the direction of the presiding judge, Relyant filed a renewed motion to amend its complaint, which (along with the government's response) was materially the same as the first motion. The government also submitted a renewed motion to amend its answer, which Relyant opposed on the ground that it had not conducted discovery necessary to defend itself against these new defenses (app. opp'n to gov't mot. to amend answer).

Under Board Rule 6(d), we generally "permit either party to amend its pleading upon conditions fair to both parties." Indeed, under the Rule, we may permit the consideration of issues "within the proper scope of the appeal, but not raised by the pleadings." And, though not binding upon us, we do look to FED. R. CIV. P. 15(a)(2), with its liberal allowance of amendments to pleadings for guidance upon that matter. *Beyley Constr. Group Corp.*, ASBCA No. 55692, 08-2 BCA ¶ 33,999 at 168,134. In short, we will not deny a request to amend without a good reason. *Id.*

Futility, however, is a good reason to deny a motion to amend a pleading, *see, e.g., Foman v. Davis*, 371 U.S. 178, 182 (1962), and there is no point in permitting an amendment to include a cause of action over which we do not possess jurisdiction.

14

Here, the government's primary argument is that two of the additional causes of action named by Relyant, superior knowledge and promissory estoppel, are not within the ambit of our jurisdiction because they were not considered by the CO within Relyant's CDA claims. The government is mistaken because the factual underpinnings of the arguments were, in fact, presented to the CO.

The seminal case delineating whether a claim submitted to a CO can support a somewhat different appeal under the CDA is *Scott Timber Co. v. United States*, 333 F.3d 1358 (Fed. Cir. 2003). In *Scott Timber*, the Federal Circuit held that appeals of CO final decisions "do[] not require rigid adherence to the exact language or structure of the original administrative CDA claim [so long as they] arise from the same operative facts, claim essentially the same relief, and merely assert differing legal theories for that recovery." *Id.* at 1365; *see also Maersk Line, Ltd.*, ASBCA Nos. 59791, 59792, 16-1 BCA ¶ 36,405 at 177,512.

Here, the operative facts in Relyant's claim fairly covered the operative facts in the two additional causes of action and the relief sought was the same. First, with respect to the superior knowledge cause of action, the claim (as noted in the Facts section, above) made just such an allegation, alleging that the government had failed to inform Relyant that it might refuse to allow the revised submittals. Thus, we find that the superior knowledge cause of action was "essentially the same as presented to the CO," *Scott Timber*, 333 F.3d at 1366, and that we have jurisdiction to consider it. Likewise, Relyant's new "promissory estoppel" cause of action is bottomed upon the factual allegation that the Bagram FET had either approved or promised to approve the submittals. Given the allegations made in Relyant's claim that 1Lt Zorn had made similar representations to Relyant and that CORs at Bagram informed Relyant that its sandwich panel would be acceptable, we find the CO was presented similar enough facts in Relyant's claim to support the jurisdictional requirement that the facts underpinning the promissory estoppel cause of action were presented to the CO.

That does not end our jurisdictional inquiry, however. Though not raised by the government, we cannot permit Relyant to raise the promissory estoppel cause of action because that theory requires a contract implied-in-law, over which we do not possess jurisdiction. *See Protecting the Homeland Innovations, LLC*, ASBCA No. 58366, 13 BCA ¶ 35,398 (promissory estoppel is a contract implied in law); *RGW Communications, Inc., d/b/a Watson Cable Co.*, ASBCA Nos. 54495, 54557, 05-2 BCA ¶ 32,972 at 163,333-34 (no Board jurisdiction over implied-in-law contracts); *see also P.J. Dick, Inc. v. GSA*, CBCA No. 461, 07-1 BCA ¶ 33,534 (Boards of Contract Appeals have no jurisdiction over promissory estoppel claims).

Thus, we possess jurisdiction to consider Relyant's amended complaint, except for the claim of promissory estoppel. Moreover, the government has identified no unfair prejudice to it by our consideration of the complaint nor any other reason that

15

we should not allow the amendment. Accordingly, under the liberal standards that apply to us pursuant to Board Rule 6(d), we grant Relyant's motion to amend its complaint, except for count VI, promissory estoppel.

With respect to the government's motion to amend its answer, Relyant presents no persuasive basis to deny it, especially since we are largely granting Relyant's motion to amend. At most, Relyant argues that it should have been able to take discovery upon the parties' intent regarding the release language, whether Relyant was under economic duress when it agreed to the modifications with the release terms within them, and why the parties moved forward with performance after the delays (app. opp'n to gov't mot. to amend answer). These are not persuasive reasons to deny the government's motion because the discovery already sought and obtained by Relyant would embrace much of what it now claims that it would have sought to address these defenses, and the remainder (such as information supporting the economic duress claims) consists of knowledge within its own purview, not the government's. Thus, with respect to fairness to both parties and under the time honored legal maxim that what is good for the goose is good for the gander, we allow the government to amend its answer.

## II. Relyant's Motion Seeking an Adverse Inference

A few days prior to the original trial date set in this matter, the government provided to Relyant several emails that had been in the personal possession of Capt Hilliard, but had not been provided in the Rule 4 file or earlier in discovery (app. adv. inf. mot. at 2-3; Bd. order dtd. 3 November 2016). There followed a number of motions to delay the trial, to partially re-open discovery, and to compel further responses from the government. On 23 November 2016, the government provided approximately 90 more pages of documents to Relyant (app. status report dtd. 2 December 2016). In the end, we extended the trial date, allowed a deposition of Capt Hilliard, and directed the government to further search for missing emails. We denied Relyant's request for additional deposition of Capt Moore (about whom, no new material evidence was disclosed by the new emails) and denied Relyant's motion to compel government actions beyond those already being undertaken (*see* Bd. orders dtd. 3 November 2016, 15 December 2016, 12 January 2017). The government ultimately represented, in the pre-hearing phase of this appeal, that it had been unable to find any retained emails from Capt Moore or CO Pleasant that were material to the appeal, likely because their email accounts for the relevant time periods were not preserved by the government (gov't opp'n to app mot. for limited reopening of discovery and mot. to compel dtd. 6 January 2017).

At Relyant's request, we permitted it to file a motion for adverse inference against the government after the hearing for its alleged discovery failures. In particular, the motion sought a finding "that Capt. Moore's emails (and other electronic

documents) and the information in the paper contract files would support Relyant's claims, including a finding that Relyant's substitution requests dated November 1, 2008, were approved by the contracting officer." (App. adv. inf. mot. at 6) Relyant further argues that an adverse inference is merited due to Capt Moore's "questionable and inconsistent" testimony at the hearing. In addition to the adverse inference, Relyant seeks attorney fees in this motion. (*Id.*) The government opposed the motion (gov't opp'n adv. inf. mot.) and Relyant filed a reply to this opposition (app. reply adv. inf. mot.).

To evaluate the motion, we must first determine whether there were documents not provided to Relyant in discovery to which it was entitled. We can readily dispose of Relyant's allegations that there were missing "paper" documents. The only basis for this allegation is explicated in Relyant's reply brief and consists of a citation to testimony that a paper contract file existed in Afghanistan that might not have been maintained as well as one kept in the United States (app. reply adv. inf. mot. at 2 (citing tr. 2/51-52, 3/39-41)). Relyant has cited no evidence that this paper file was not reproduced with the initial Rule 4 file, which, to all appearances, includes the contract modifications and other paperwork that we would expect to have been maintained in such a file.

With respect to Capt Moore's and CO Pleasant's emails, although it appears very likely that there were emails that may have been responsive to discovery requests if they had been in the government's possession at the time that they were requested, a review of the declarations attached to the government's opposition to Relyant's motion leads us to conclude that, by late 2009 for Capt Moore, and sometime in early 2011 for CO Pleasant, the emails were no longer in the possession of the government. Capt Moore's declaration explains that he did not take any electronic files with him when he departed Afghanistan in March 2009 (gov't opp'n adv. inf. mot., attach., Moore decl.), and Lt Col William Brown's declaration that the servers which held government emails in Afghanistan did not retain email accounts beyond 45 days of employees' departure from Afghanistan (*see* gov't opp'n adv. inf. mot., attach., Brown decl.), taken together, demonstrate that, after May or June 2009, Capt Moore's emails were likely unretrievable. CO Pleasant's declaration that she retired from federal service on 1 January 2010 after which she had no access to her government email (gov't opp'n adv. inf. mot., attach., Pleasant decl.),[22] combined with Mr. Anthony Crossen's declaration that retirees' email accounts at the Rock Island Arsenal (where CO Pleasant worked) are deleted within 45 days of retirement and archived for only a year afterwards (gov't opp'n adv. inf. mot., attach., Crossen decl.) convince us that, after March or April 2011, CO Pleasant's emails were likely

---

[22] We refer here to CO Pleasant's access to the government email account she used as a CO, and not any subsequent email account she may have used as a rehired annuitant in a non-CO related capacity.

irretrievable. Relyant's reply to the government's opposition does not dispute the facts presented by these declarations, except to argue that recipients of emails from Capt Moore should have had their email searched (app. reply adv. inf. mot. at 1-2). These potential recipients were also in Afghanistan, however, and would have had their email accounts deleted upon their departures just as Capt Moore did.

The first claim submitted to a CO upon this contract (which was later appealed in ASBCA No. 58172, 16-1 BCA ¶ 36,228) was submitted on 15 December 2011, denied by the government on 20 March 2012, and appealed to the Board on 13 June 2012 (*see* Bd. corr. file, ASBCA No. 58172, notice of appeal and attachments).

With these salient facts in mind, we turn to the law of spoliation, upon which Relyant relies to obtain the remedy it seeks. "Spoliation refers to the 'destruction or material alteration of evidence or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation.'" *ADT Constr. Group, Inc.*, ASBCA No. 55358, 13 BCA ¶ 35,307 at 173,324 (quoting *Hynix Semiconductor Inc. v. Rambus Inc.*, 645 F.3d 1336, 1334 (Fed. Cir. 2011)); *see also Micron Technology, Inc. v. Rambus Inc.*, 645 F.3d 1311, 1319-20 (Fed. Cir. 2011). To obtain sanctions for spoliation, the moving party must prove:

> (1) [T]he party having control over the evidence had an obligation to preserve it when it was destroyed or altered; (2) the destruction or loss was accompanied by a "culpable state of mind;" and (3) the evidence that was destroyed or altered was "relevant" to the claims or defenses of the party that sought the discovery of the spoliated evidence, to the extent that a reasonable factfinder could conclude that the lost evidence would have supported the claims or defenses of the party that sought it.

*ADT*, 13 BCA ¶ 35,307 at 173,324-25 (citations omitted); *see also Ensign-Bickford Aerospace & Defense Co.*, ASBCA No. 57929, 13 BCA ¶ 35,322 at 173,385. With respect to the first element here, whether a party has an obligation to preserve evidence, this is determined by whether litigation is "pending or reasonably foreseeable." *Micron Technology*, 645 F.3d at 1320. With respect to the third element necessary for obtaining sanctions, it is essentially a question of prejudice, and the moving party has the burden of "com[ing] forward with plausible, concrete suggestions as to what [the destroyed] evidence might have been." *Id.* at 1328 (citations omitted). When bad faith is proved, however, there is a strong inference that the destroyed evidence would have been unfavorable to the party destroying it. *Id.*

Here, it is evident to us that the destruction of any email occurred before litigation was reasonably foreseeable. The government argues that the key date for

18

determining foreseeability is when the appeal was filed before the Board (gov't opp'n adv. inf. mot. at 9). We are not so certain, and entertain the *possibility* that the better date could have been when the claim was submitted to the CO or when the claim was denied. In any event, we need not decide that issue today, because even if we assume that the duty to preserve evidence was triggered by the submission of a claim to the CO, that event occurred in December 2011, after the emails had likely been permanently deleted under standard protocol. Thus, there is no spoliation here and we could deny Relyant's motion without further analysis.

We do note, however, that even if the government negligently allowed the email to be destroyed at a time that it had a duty to preserve it and that such negligence constituted a "culpable state of mind" (a legal consideration which we do not decide here, although we certainly see no evidentiary basis for a finding of bad faith), we would find that Relyant has not proved prejudice of the sort that would justify making the inferences that it requests. Factually, Relyant has produced no evidence, whatsoever, that would permit us to conclude that the missing emails might support its version of events. To the contrary, all of the evidence before us supports the conclusion (as discussed in the facts section, above) that the emails would have contained no evidence supporting Relyant's desired inference. When we consider the fact that Relyant, itself, has produced no emails or other documents that should have been in its own possession supporting its allegation that the CO "approved" its proposed changes to the SOW, we are even less inclined to believe that Relyant was wronged: the careful limits placed upon the proper application of sanctions for spoliation, as discussed in the cases set forth above, make clear the law of spoliation is not intended to provide an unmerited windfall to a party, contrary to what the actual facts of a dispute support.

Last, Relyant's argument that an adverse inference is justified by Capt Moore's "questionable and inconsistent" testimony at the hearing (app. adv. inf. mot. at 6) is a non-starter. A review of Capt Moore's testimony gives us little reason to question his sincerity, and those points where his recollection of events diverges from that of other participants to the same events are nothing but the routine manifestation of flaws in memory typical of matters that occurred over seven years prior. They are not material to our decision and do not merit the (effectively) dispositive relief requested by Relyant here.

## DECISION ON THE MERITS

We may have come to different conclusions regarding the advisability of using the sandwich panel if we had stood in the shoes of the CO in 2009, but we did not and that is not our role. The facts are that the government was within its rights to refuse the sandwich panel, it never actually approved its use, and the contract makes clear that acceptance of the FAT does not equal acceptance of the change in the SOW.

19

Moreover, the government's knowledge that it might reject Relyant's proposed change to the contract was no greater than Relyant's, given that Relyant was also apprised of that possibility. We do find, however, that the government's waiting for months to make up its mind about the sandwich panel while Relyant was left unable to proceed in Bagram caused compensable injury to Relyant, for which we award the damages proved by Relyant. Finally, we hold that the damages that we award were not waived by the bilateral contract modifications referenced by the government.

I.      The Government was Within its Contractual Rights to Require Compliance with the SOW at Bagram

As a straightforward matter of contract interpretation, the SOW required the use of the drywall/insulation combination, and the government was entitled to hold Relyant to it, until the contract was modified, regardless of whether it was a good or bad idea. *See, e.g., Rixon Electronics, Inc. v. United States*, 536 F.2d 1345, 1351 (Ct. Cl. 1976) (the government "can engage a contractor to make snowmen in August, if [it spells] it out clearly"); *see also Wagner Awning & Mfg. Co.*, ASBCA No. 19986, 77-2 BCA ¶ 12,720 at 61,827 (government entitled to strict compliance with contract terms even if alternative techniques might be suitable). The question before us, then, is whether the contract's SOW was ever amended, either by the CO or through the government's approval of FAT. It was not.

A.      No Contractual Amendment Allowing Use of the Sandwich Panel was Ever Approved by the CO

Under the contract, only the CO possesses authority to amend the terms of the SOW. Indeed, the CO reiterated this principle to Relyant on more than one occasion, as discussed in the "Facts" section, above. Even if a member or members of the FET at Sharana got ahead of themselves (as might have been the case), their unauthorized approval is insufficient to change the contract. *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947) (companies dealing with government take risk of ensuring the persons they deal with are acting within the scope of their authority); *see also Winter v. Cath-dr/Balti Joint Venture*, 497 F.3d 1339, 1345-46 (Fed. Cir. 2007) (limits of authority to amend contract when contract makes clear that only the CO possesses such authority). As we analyzed in great detail above, we are convinced that Relyant's allegation that the contract was amended by an unspecified CO is not supported by a preponderance of the evidence. Such a finding (notwithstanding the vague testimony of Relyant's project managers) would be contrary to the great weight of the evidence before us. Accordingly, we hold that there was no amendment of the SOW to contractually permit the use of the sandwich panel.[23]

---

[23] Relyant also presents an undeveloped "acquiescence" argument in its opening brief, suggesting that, since the government knew that Relyant was using the

20

## B. The FAT does Not Overrule Contract Specifications

Relyant extensively argues that, by virtue of approving the FAT of RLB cans that utilized the sandwich panel, the government effectively approved an amended SOW (app. br. at 15-16). Not so. To be sure, on the record before us, we find the approval of the FAT to be inexplicable, and can only speculate as to why it happened. Just as we may only speculate about why the nonconforming cans were apparently accepted at Sharana. Nevertheless, we do not need to know why the FAT was approved to know that the approval had no effect on the terms of the SOW. That is because, as noted above, the FAT clause clearly provides in paragraph (b) that, "The notice of...approval [of the test] shall not relieve the Contractor from complying with all requirements of the specifications and all other specifications and all other terms and conditions of the contract." This is especially clear since the CO told Relyant that its changes to the SOW were rejected before it received the FAT results, and Relyant never acted as if the FAT results changed its understanding of what was permitted at Bagram.

Thus, we conclude that the terms of the contract's SOW required use of the drywall/insulation combination and that the government never changed that requirement through a contract modification or through the approval of the FAT.

## II. The Government did Not Possess Undisclosed Superior Knowledge

Relyant makes the argument that the government failed to inform it that it would not permit the use of the sandwich panel, thus breaching the contract by failing to disclose superior knowledge (app. br. at 18-19). This argument founders upon the facts.

The doctrine of superior knowledge is premised upon the notion that where "the government has knowledge of vital information that will affect a contractor's performance, the government is obligated to share that information." *Am. Ordnance LLC*, ASBCA No. 54718, 10-1 BCA ¶ 34,386 at 169,787 (citing *Helene Curtis*

---

sandwich panel and did not stop it, it tacitly agreed to the contract change (*see* app. br. at 15). The evidence discussed later in this opinion, regarding superior knowledge, demonstrates that the government never did completely agree to allow the use of the sandwich panel, and it would have been unreasonable for Relyant to believe the requirement to be "dead." *See, e.g., Gresham & Co. v. United States*, 470 F.2d 542, 554 (Ct. Cl. 1972) (waiver requires party to "reasonably believe[] the requirement to be dead"). The fact that the FAT approval came *after* the clear, formal rejection of Relyant's request to amend the SOW precludes any argument that FAT approval signaled that the SOW requirements were inoperative.

*Industries, Inc. v. United States*, 312 F.2d 774 (Ct. Cl. 1963)); *see also Hercules, Inc. v. United States*, 24 F.3d 188, 196-97 (Fed. Cir. 1994). The elements of the cause of action, as set forth in *Hercules*, are that (1) the contractor undertook to perform without vital knowledge of a fact that affects performance costs or duration; (2) the government was aware that the contractor lacked the knowledge and would not have reason to obtain it; (3) any contract specification provided either misled the contractor or did not put it on notice to inquire; and (4) the government failed to provide the relevant information. 24 F.3d at 196; *see also Giesler v. United States*, 232 F.3d 864, 876 (Fed. Cir. 2000).

First, the government did not mislead Relyant as to what the SOW required when it awarded it the contract. To be sure, Relyant made the assumption that its alternate sandwich panel method was approved, but the contract stated otherwise, and Relyant conceded that its proposal allowed for the possibility that the government would choose to stick with the specifications contained within the SOW. The government had no reason, at the time of contract award, to believe that Relyant misapprehended the plain language of the contract — a matter for which Relyant bears sole responsibility.

As contract performance progressed in 2008 through 2009, the government's multiple requests for Relyant to provide submittals with its alternate sandwich panel construction would have plainly disabused Relyant of any mistaken belief that the government had approved its sandwich panel construction. To the extent that Relyant is arguing that the government withheld from it knowledge that the government always intended to reject its sandwich panel design, we find the premise to be unsupported. The only evidence before us is that the government made its definitive decision regarding rejection of the sandwich panels in August 2009, after 1Lt Schultz became COR at Bagram. All other documents and testimony indicate that the decision was in flux. The 21 April 2009 email from 1Lt Zorn to others within the government which Relyant hails as proving that the government was hiding information from it and that the government knew Relyant was mistaken in its beliefs that the submittal would be approved (*see* app. br. at 18), does nothing of the sort. In the email, 1Lt Zorn makes clear that Relyant was informed of the need to provide submittals (which it had not yet done) and that the changes might be approved, but they might not. This is hardly the smoking gun Relyant asserts it to be. The subsequent Zorn email to Relyant, on 13 May 2009, in which he informs Relyant that the FET had approved the changes, also cautions Relyant against taking action prematurely, including the statement: "I'm not sure if I can give you the go ahead – I wouldn't want to direct you and then something change." It may well be that 1Lt Zorn was overoptimistic or simply wrong regarding the FET's approvals; based upon his statement in the same email that he believed the change had already been approved, we surmise that he may have confused other agreed-upon changes to the SOW with the broader notion that all changes had been approved by the FET. But his clear statement that the CO had not yet approved

the changes and that he would not direct Relyant to act in case something changed, should have made clear to a reasonable contractor in Relyant's position that the government's agreement to change the SOW was not certain. Thus, the government possessed no knowledge superior to that of Relyant as that phrase is interpreted by the law.[24]

We note here that although we did not consider Relyant's promissory estoppel claim because it is based upon a contract implied-in-law, of which we possess no jurisdiction, we would have rejected such a claim in any event for the reasons discussed above: it is bottomed upon the notion that 1Lt Zorn misled Relyant, and the evidence supports a much more nuanced view of what he told Relyant.

III. The Government's Failure to Act upon the Request for Submittals for Four Months was a Breach of the Duty of Good Faith and Fair Dealing[25]

Though rejecting the sandwich panel was permissible, and we do not find that the government misled Relyant, we do find that allowing Relyant to, figuratively, "twist in the wind" from late April to early August 2009 as the government mulled whether to allow the sandwich panel was contrary to Relyant's reasonable contract-based expectations. This is actionable as a breach of the duty of good faith and fair dealing.

The doctrine of good faith and fair dealing is based upon the notion that every contract "imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." *Metcalf Constr. Co. v. United States*, 742 F.3d 984, 990 (Fed. Cir. 2014) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 205 (1981)); *see also Kelly-Ryan, Inc.*, ASBCA No. 57168, 18-1 BCA ¶ 36,944 at 180,030. Pursuant to this implicit duty, each party's obligations "include the duty not to interfere with the other party's performance and not to act so as to destroy the

---

[24] Additionally, if we were to find that the promises of an unauthorized individual that the CO was going to approve a change were effectively binding (as would be the case if we were to grant Relyant relief here), we would short circuit the law cited earlier in this decision that allows the government only to incur contractual obligations by the actions of those authorized to make such obligations. Needless to say, we would be loath to do so and the facts at bar conclude such a determination.

[25] Relyant might have potentially argued that this inaction constituted a delay for which the government was liable, without seeking recourse through the doctrine of good faith and fair dealing. *See, e.g., Rivera Construction Co.*, ASBCA Nos. 29391, 30207, 88-2 BCA ¶ 20,750 at 104,854. Relyant did not make this argument, however, and, given concurrent delays in FAT approval, we decline to take this approach not requested by Relyant.

23

reasonable expectations of the other party regarding the fruits of the contract." *Metcalf*, 742 F.3d at 991 (quoting *Centex Corp. v. United States*, 395 F.3d 1283, 1304 (Fed. Cir. 2005)).

Yet, this implicit duty "cannot expand a party's contractual duties beyond those in the express contract or create duties inconsistent with the contract's provisions." *Metcalf*, 742 F.3d at 991 (quoting *Precision Pine & Timber, Inc. v. United States*, 596 F.3d 817, 831 (Fed. Cir. 2010)). Thus, the duty "is limited by the original bargain: it prevents a party's acts or omissions that, though not proscribed by the contract expressly, are inconsistent with the contract's purpose and deprive the other party of the contemplated value." *Metcalf*, 742 F.3d at 991.

Some of the tests set forth in the cases above, read in isolation, are not as precise as we would like, and may appear to leave too much room for an arbitrary drawing of lines to obtain results deemed "fair" by a reviewing tribunal. One seeming inconsistency is that, if the duties cannot be expanded beyond those set forth in the express contract, how can there be *any* new duties imposed by good faith and fair dealing? Yet, plainly the point of the doctrine is that such duties exist. We resolve this by concluding that the doctrine imposes duties that fall within the broad outlines set forth by the express terms of the contract, approximating the parties' intent, as divined by the express terms of the contract, for addressing circumstances not specifically set forth by the contract. This interpretation is consistent with the *Metcalf* court's reference to "faithfulness to an agreed common purpose." 742 F.3d at 991 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. a). As we noted in a pre-*Metcalf* opinion, the proper inquiry regarding the duty often boils down to questions of "reasonableness" of the government's actions, *see Free & Ben, Inc.*, ASBCA No. 56129, 09-1 BCA ¶ 34,127 at 168,742, although we do not hold here that every unreasonable government action necessarily constitutes a breach of the duty.

Thus we turn to the facts of this appeal. The doctrine does not permit us to change the terms of the SOW or to punish the government for its failure to do so: the SOW is explicitly defined by the contract and thus may not be altered by the implicit duty of good faith and fair dealing. On the other hand, though the contract does not specify how long the government will spend reviewing requests to modify the SOW,[26] if the government's delays in addressing Relyant's requests unreasonably interfered with contract performance, we could find breach.

At what point did government inaction on Relyant's request turn into breach? Later than Relyant argues. Although Relyant's first formal request for the relevant change to the SOW was submitted on 1 November 2008, the government's failure to deal with it at that time, given the computer problems it encountered, is not a breach of

---

[26] If it did so, those deadlines would be dispositive.

the duty of good faith and fair dealing. We have found above that the government informed Relyant that the request needed to be resubmitted and that Relyant did not, in fact, resubmit it until 22 April 2009 (notwithstanding Relyant's assertion otherwise in that 22 April email). Thus, we find that any delay by the government should run from the time that the 22 April 2009 submittal was provided by Relyant, and not earlier. Of course, some period of time would have been necessary for the government to consider and act upon the submittal. Since 1Lt Schultz was able to make her recommendation and obtain the CO's concurrence in less than a week in August 2009, we hold that a reasonable amount of time for approval or rejection of the 22 April 2009 submittal would have been the first of May 2009 and (in the case before us) further hold that the government's failure to act by then constituted a breach of the duty of good faith and fair dealing.

The factors that support this conclusion overlap to some degree and include that: 1) the requested change to the SOW was one with which the government was familiar; 2) it was recognized by the government as being reasonable and potentially in its best interest; 3) the government was aware that Relyant was awaiting its answer for several months in the spring and summer of 2009, while Relyant continually prompted it to act; 4) the government was aware that its delay in decision-making was potentially to the detriment of Relyant in terms of its incurring additional costs during the waiting period; 5) there were no circumstances that justified an extended wait on the part of the government before deciding whether to permit the change in the SOW; and 6) the government's decision-making appears to have been able to have been accomplished within a matter of days once it turned its attention to the matter. Given all of these considerations, the government's failure to act in a more timely manner here was "inconsistent with the contract's purpose and deprive[d] the other party of the contemplated value." *Metcalf*, 742 F.3d at 991. These factors should make clear that our decision today is very fact-specific. For example, in the event that a contractor requested a change to the SOW for which it had no realistic chance of approval, we might be less likely to find a breach of the duty if the government took an extensive period of time to resolve it.

We now turn to damages for the contractual breach. "The remedy for breach of contract is damages sufficient to place the injured party in as good a position as it would have been had the breaching party fully performed." *Indiana Michigan Power Co. v. United States*, 422 F.3d 1369, 1373 (Fed. Cir. 2005) (citation omitted). Thus, our 1 May 2009 date has important implications for the calculation of damages due to Relyant. In particular, since the first DO2 RLB cans had already been delivered to Bagram before that time, the government is not responsible for Relyant's costs for transshipping the cans to Sharana after their rejection in August. It also defines the time that the government should be held responsible for extra costs: May through early August 2009. But those costs are limited to the costs incurred at Bagram, where two Relyant employees awaited the go-ahead to begin assembly operations.

25

According to the evidence presented by Relyant and not disputed by the government, that amount was $151,816 (the $172,004 in burdened labor costs for April through August 2009 minus the $20,188 for the month of April 2009). The delay in approval of the submittal appears to have had no impact upon construction at Sharana because the FAT there was not approved until a time in August 2009 *after* denial of the SOW submittals. Since Relyant has not alleged that the FAT was unreasonably delayed and has provided no evidence that it could have proceeded elsewhere prior to the FAT, we conclude that it is not entitled to other delay damages. *See, e.g., Melka Marine, Inc. v. United States*, 187 F.3d 1370, 1375 (Fed. Cir. 1999) (no overhead damages when contractor not on standby as a result of government delay); *Rex Systems Inc.*, ASBCA No. 59624, 16-1 BCA ¶ 36,350.

## IV. Relyant did Not Waive its Rights to Challenge the CO's Actions Here

The government has asserted, through its affirmative defense, that Relyant has waived its claims (gov't br. at 42-46). There are basically three arguments made by the government here: the first is that Relyant's continued performance, despite the government's breach, constituted a waiver of Relyant's rights because Relyant's silence was to the disadvantage of the government (*id.* at 42-43); second, that bilateral modifications to contract due dates acted to eliminate the government's liability for damages (*id.* at 43-44) under the theory that once the bilateral modifications are in place, the parties are to "let bygones be bygones" (*id.* at 43-44 (quoting *Environmental Devices, Inc.*, ASBCA No. 37340 *et al.*, 93-3 BCA ¶ 26,138 at 129,934)); and third – a theory which we need not address because we find no government liability for the matter – is that Relyant's costs incurred shipping cans from Bagram to Sharana (once they were rejected in Bagram) are covered by the release language in Modification No. P00002 to DO1.[27] The government's first theory, that continued performance of a contract in the face of a breach constitutes waiver, is a gross misreading of the relevant law. Likewise, the bilateral modification theory does not, in fact, protect the government from the liability that we have found above, especially given the glaring lack of appropriate mutual releases.

With respect to the theory that Relyant's continued performance of the contract constituted a waiver, we turn to the law cited by the government – primarily *Ling-Temco-Vought, Inc. v. United States*, 475 F.2d 630 (Ct. Cl. 1973) (*see* gov't br. at 42), and see that it is not remotely like the circumstances presented here. In *Ling-Temco*, the continued performance in the face of an alleged material breach (of which the government was unaware), placed the government in a significantly disadvantaged position, essentially invoking considerations of estoppel. 475 F.2d

---

[27] We note that we would have been skeptical of this argument: *inter alia*, the release was executed well before the present disputes and, at first blush, would not have appeared to cover them.

26

at 638-39. Here, the government posits no plausibly similar circumstances and was well aware that Relyant considered itself wronged. No injustice was done to the government by Relyant's timely bringing of its routine claims in this matter pursuant to the contract's Disputes clause.[28]

Turning to the government's argument that a bilateral contract modification on scheduling acts to eliminate any claim relating to the government's tardiness in contract administration, an examination of the authority relied upon by the government, primarily *Environmental Devices*, demonstrates that the government overstates its reach. The basic notion in *Environmental Devices* is that, when the parties agree to a new completion date for a contract, that is the date that the contractor is representing it will meet in the absence of new causes of delay. Thus, as stated by *RFI Shield-Rooms*, ASBCA Nos. 17374, 77-2 BCA ¶ 12,714 at 61,731 (quoted by *Environmental Devices, Inc.*, ASBCA No. 37430 *et al.*, 93-3 BCA ¶ 26,138 at 129,934) "the action of the parties in agreeing upon a new delivery schedule eliminates from consideration the causes of delay accruing prior to such agreement." Letting "bygones be bygones," in this context, does not wipe the slate clean as far as the government's liability for the imposition of all additional costs goes; rather, it only deals with costs associated with the new schedule. The costs of the Relyant employees wasting their time in Bagram due to government inaction on the request to amend the SOW are not such precluded costs. Had the government wished to insulate itself from such potential costs, it could have negotiated a release clause as it did in the change order relating to delivery costs. It did not do so and must accept the consequences of this decision.

---

[28] The government also cites *Brand S Roofing*, ASBCA No. 24688, 82-1 BCA ¶ 15,513, as somehow supporting its position (*see* gov't br. at 42). *Brand S Roofing* did allow, in the circumstances there presented, that the contractor could be excused from continuing performance in light of a government material breach. *See* 82-1 BCA ¶ 15,513 at 76,958-59. But we made clear that under "normal circumstances," compliance with the dictates of the Disputes clause was to be expected by the contractor. *Id.* at 76,958. The government cannot convincingly explain why the dispute here is not a "normal" situation.

## CONCLUSION

The government did not change the SOW to meet Relyant's desires and was under no obligation to do so. Nevertheless, under the circumstances presented here, its inexcusable delay in deciding the request left Relyant in an untenable position for more than two months. Accordingly, the government is liable to Relyant in the amount of damages proved, $151,816, with CDA interest starting from the time it filed its claim, 23 January 2015.

Dated: June 27, 2018

J. REID PROUTY
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

REBA PAGE
Administrative Judge
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 59809, Appeal of Relyant, LLC, rendered in conformance with the Board's Charter.

Dated:

JEFFREY D. GARDIN
Recorder, Armed Services
Board of Contract Appeals

28